# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------x
: 
*In re* : **Chapter 11**
: 
**NTK HOLDINGS, INC., *et al.*,**[1] : **Case No. 09 – 13611 (   )**
: 
**Debtors.** : **(Jointly Administered)**
: 
-------------------------------------------------------x

## DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO PAY THE PREPETITION CLAIMS OF CERTAIN CREDITORS IN THE ORDINARY COURSE OF BUSINESS

NTK Holdings, Inc. ("***NTK Holdings***"), and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "***Debtors***," and together with their non-debtor affiliates, "***Nortek***"), submit this motion (the "***Motion***") pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "***Bankruptcy Code***"), authorizing, but not directing, the Debtors to pay prepetition claims of certain creditors in the ordinary course of business (the "***Motion***"). In support of the Motion, the Debtors submit the *Declaration of Richard L. Bready in Support of the Debtors' Chapter 11 Petitions and Request*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: NTK Holdings, Inc. (4298); Nortek Holdings, Inc. (9907); Nortek, Inc. (4991); Aigis Mechtronics, Inc. (6764); Broan-Mexico Holdings, Inc. (1438); Broan-NuTone LLC (4397); Broan-NuTone Storage Solutions LP (4328); CES Group, Inc. (5781); CES International Ltd. (6119); Cleanpak International, Inc. (2925); Elan Home Systems, L.L.C. (7629); Gefen, Inc. (1217); Governair Corporation (1240); GTO, Inc. (6645); HC Installations, Inc. (0110); Huntair, Inc. (2838); International Electronics, LLC (4321); Linear LLC (9070); Linear H.K. LLC (9638); Lite Touch, Inc. (0152); Magenta Research Ltd. (5160); Mammoth-Webco, Inc. (3077); Niles Audio Corporation (2001); Nordyne Inc. (4381); NORDYNE International, Inc. (7842); Nortek International, Inc. (0717); NuTone LLC (9551); OmniMount Systems, Inc. (7936); Operator Specialty Company, Inc. (6248); Pacific Zephyr Range Hood, Inc. (8936); Panamax Inc. (0890); Rangaire GP, Inc. (4327); Rangaire LP, Inc. (9900); Secure Wireless, Inc. (2485); SpeakerCraft, Inc. (6374); Temtrol, Inc. (3996); Xantech Corporation (1552); and Zephyr Corporation (1650). The Debtors' principal offices are located at 50 Kennedy Plaza, Suite 1900, Providence, Rhode Island 02903. The addresses for all of the Debtors are available at the website chapter11.epiqsystems.com/nortek.

*for First Day Relief* (the "***Bready Declaration***") filed contemporaneously herewith, and respectfully represent as follows:

## Background

1.     On the date hereof (the "***Commencement Date***"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Further, a motion pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") for joint administration of the Debtors' chapter 11 cases is pending before this Court.

2.     Prior to the Commencement Date, the Debtors solicited votes on the Joint Prepackaged Plans of Reorganization of NTK Holdings, Inc., *et al.* (the "***Prepackaged Plan***") through a disclosure statement distributed in accordance with sections 1125 and 1126(b) of the Bankruptcy Code (the "***Disclosure Statement***"). As discussed more fully below, the Prepackaged Plan has been accepted by all but one of the impaired classes entitled to vote in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code.

## Nortek's Businesses

3.     Nortek (through its wholly-owned subsidiaries) is a diversified manufacturer and distributor of innovative, high-quality and competitively-priced building products for residential, light commercial and commercial applications. Nortek's products are designed to meet the needs of professionals in the new construction and remodeling markets as well as individual contractors, wholesalers and do-it-yourself customers around the world.

4. Nortek operates within four (4) business segments: the Residential Ventilation Products ("***RVP***") segment, the Home Technology Products ("***HTP***") segment, the Residential Air Conditioning and Heating Products ("***Residential HVAC***") segment, and the Commercial Air Conditioning and Heating Products ("***Commercial HVAC***") segment. Through these segments, Nortek manufactures and sells its products primarily to customers throughout the United States, Canada and Europe.

5. The RVP segment manufactures and distributes room and whole-house ventilation products and other products primarily for the professional remodeling and replacement markets, residential new construction market and do-it-yourself market. The principal products of the segment, which are sold under the Broan®, NuTone®, Venmar®, Best®, and Zephyr® brand names, among others, are: (i) kitchen range hoods, (ii) exhaust fans (such as bath fans and fan, heater and light combination units), and (iii) indoor air quality products. Nortek is one of the world's largest suppliers of residential range hoods and exhaust fans, and is the largest supplier of these products in North America.

6. The HTP segment manufactures and distributes a broad array of products designed to provide convenience and security for residential and certain commercial applications. The principal products of the segment, which are sold under the Niles®, Elan®, HomeLogic®, SpeakerCraft®, Proficient Audio Systems®, Sunfire®, Xantech®, Channel Plus®, Linear®, Mighty Mule®, OSCO®, Aigis®, Open House®, Magenta™, LiteTouch®, and Gefen® brand names, are: (i) audio/video distribution and control equipment, speakers, subwoofers, audio/video wall mounts and fixtures, (ii) security and access control products, (iii) power conditioners and surge protectors, (iv) lighting and home automation controls, and (v) structured wiring. Nortek sells the products in its HTP segment to distributors, professional

installers, electronics retailers, and original equipment manufacturers. Sales in this segment are primarily driven by replacement applications, new installations in existing properties and the purchase of high-priced audio/video equipment such as flat panel televisions and displays.

7.    The Residential HVAC segment principally manufactures and sells split-system air conditioners, heat pumps, air handlers, furnaces and related equipment, accessories and parts for the residential and certain commercial markets. For site-built homes and certain commercial structures, the segment markets its products under the licensed brand names Frigidaire®, Tappan®, Philco®, Kelvinator®, Gibson®, Westinghouse®, Broan®, Nutone®, and Maytag®. Within the residential market, Nortek is one of the largest suppliers of HVAC products for manufactured homes in the United States and Canada under the brand names Miller® and Intertherm®.

8.    The Commercial HVAC segment manufactures and sells HVAC systems that are custom-designed to meet customer specifications for commercial offices, manufacturing and educational facilities, hospitals, retail stores, clean rooms and governmental buildings. These systems are designed primarily to operate on building rooftops, or on individual floors within a building, and to have cooling capacities. The segment markets its commercial HVAC products under the Governair®, Mammoth®, Temtrol®, Venmar CES™, Ventrol®, Webco®, Huntair®, Cleanpak™, and Fanwall® brand names. Nortek is one of the largest suppliers of custom-designed commercial HVAC products in the United States.

9.    As of the Commencement Date, the Debtors' capital structure consisted of (i) approximately $750 million in 10% Senior Secured Notes due 2013 (the "*10% Notes*"), secured by a first priority lien on substantially all of Nortek's and its domestic subsidiaries' tangible and intangible assets other than those assets securing Nortek, Inc.'s five-year $350

million senior secured asset-based revolving credit facility (the "*ABL Facility*");

(ii) approximately $135 million drawn under the ABL Facility, which amounts are secured by a first lien on all accounts receivable and inventory and a second lien on all other assets of Nortek, Inc. and its domestic subsidiaries; (iii) approximately $625 million aggregate principal amount outstanding in Nortek, Inc. 8 ½% Senior Subordinated Notes due 2014 (the "*8 ½% Notes*");
(iv) approximately $10 million aggregate principal amount outstanding in Nortek, Inc. Series A and Series B 9 ⅞% Senior Subordinated Notes due 2011 (the "*9 ⅞% Notes*"); (v) approximately $403 million in NTK Holdings 10 ¾% Senior Discount Notes due 2014 (the "*NTK 10 ¾% Notes*"); and (vi) approximately $286 million owed pursuant to that certain NTK Holdings Senior Unsecured Loan dated as of May 10, 2006 (the "*Bridge Loan*"). There is no established public trading market for the Debtors' capital stock. Thomas H. Lee Partners, L.P. and certain of its affiliates maintain the position of controlling shareholder of NTK Holdings.

10. NTK Holdings is the parent corporation of Nortek Holdings, Inc., which is the parent corporation of Nortek, Inc. The other Debtors are wholly-owned direct or indirect subsidiaries of Nortek, Inc. (collectively, the "*Subsidiary Debtors*"). All business operations are carried out by Nortek, Inc., the Subsidiary Debtors, and Nortek, Inc.'s non-debtor subsidiaries. Nortek's principal executive offices are located at 50 Kennedy Plaza, Providence, Rhode Island 02903.

11. As of the Commencement Date, the Debtors had approximately 4,534 employees in North America and the Debtors' and their non-debtor subsidiaries' unaudited consolidated financial statements reflected $926,800,000 of net sales for the 6-month period ended July 4, 2009. As of July 4, 2009, Debtors and their non-debtor subsidiaries had total assets of approximately $1,655,200,000 and total liabilities of approximately $2,778,100,000.

## The Nortek Prepackaged Plan

12.    As described in more detail in the Bready Declaration, prior to the Commencement Date, Nortek engaged in negotiations over the terms of a financial restructuring with its core creditor groups. These negotiations culminated in the agreement by certain holders (collectively, the "*Ad Hoc Committee*") of (i) more than 66 2/3% of the outstanding principal amount of the 8 ½% Notes, (ii) a majority of the outstanding principal amount of the NTK 10 ¾% Notes, and (iii) a significant portion of the outstanding principal amount of the 10% Notes to enter into Restructuring and Lock-Up Agreements (the "*Restructuring Agreements*") with Nortek, pursuant to which the members of the Ad Hoc Committee agreed to vote in favor of the Prepackaged Plan provided that certain conditions and milestones were satisfied.

13.    In accordance with the terms of the Restructuring Agreements, on September 18, 2009, the Debtors commenced a solicitation of votes from all classes entitled to vote under the Bankruptcy Code. The Prepackaged Plan has been accepted in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code by all of the impaired classes of claims against Nortek, Inc.

14.    Among the classes of claims against NTK Holdings, the class consisting of holders of NTK 10 ¾% Notes voted to accept the Prepackaged Plan, while the class consisting of lenders under the Bridge Loan voted to reject the Prepackaged Plan. The Debtors believe they have satisfied the requirements of section 1129(b) of the Bankruptcy Code and intend to seek confirmation of the Prepackaged Plan notwithstanding the rejection of the Prepackaged Plan by the Bridge Loan lenders.

15.    Under the terms of the Prepackaged Plan, holders of the 8 ½% Notes and the 9 ⅞% Notes will receive 93% of the equity in the Reorganized Debtors. Holders of the 10%

Notes will receive 5% of the equity in the Reorganized Debtors, and will also receive new notes

bearing interest at 11% per annum in a face amount of $750 million plus accrued but unpaid

obligations (including interest) as of the effective date of the Prepackaged Plan.[2] Holders of the

NTK 10 ¾% Notes and holders of claims arising under the Bridge Loan will receive the

remaining 2% of equity in the Reorganized Debtors, as well as certain warrants for the future

purchase of additional equity.

16.     In addition, the Prepackaged Plan provides for the payment in full of

(i) allowed administrative expense claims, (ii) federal, state, and local tax claims, and (iii) certain

other priority non-tax claims.  Trade creditors and certain other holders of general unsecured

claims against Nortek, Inc. and the Subsidiary Debtors are unimpaired under the Prepackaged

Plan and will receive payment in full on account of their claims on the latest of (i) the effective

date of the Prepackaged Plan (or as soon thereafter as reasonably practicable), (ii) the date on

which such claim would be paid in the ordinary course of the Debtors' business, or (iii) as

otherwise agreed by the Debtors and the holder of such claim.  Holders of equity interests in

NTK Holdings, the Debtors' ultimate corporate parent, will not receive a distribution.

17.     The Prepackaged Plan contemplates a comprehensive financial

restructuring of the Debtors' existing capital structure that will allow the Debtors to delever their

balance sheet through short and consensual chapter 11 cases, and emerge from chapter 11 poised

for future growth and stability.  Contemporaneously herewith, the Debtors have filed a motion

---

[2] The Prepackaged Plan entitles holders of the 10% Notes to this distribution because such holders voted to accept
the Prepackaged Plan in amounts exceeding the statutory thresholds of section 1126 of the Bankruptcy Code.  Had
the class voted to reject the Prepackaged Plan, the Prepackaged Plan provided that claims arising under the 10%
Notes would be reinstated or would receive such distributions as required by section 1129(b) of the Bankruptcy
Code.

requesting a confirmation hearing for December and plan to emerge from chapter 11 before the end of the year.

## Jurisdiction and Venue

18.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

19.     By this Motion, the Debtors request entry of an order substantially in the form attached hereto as Exhibit "A" (the "***Proposed Order***") authorizing but not directing the Debtors, subject to the procedures set forth herein, to pay, in the ordinary course of business, the liquidated, noncontingent, and undisputed prepetition claims (the "***Payable Claims***") of holders of Nortek General Unsecured Claims and Nortek Other Secured Claims[3] (each as defined in the Prepackaged Plan) (collectively the "***Prepetition Creditors***").

20.     The Debtors request that the Proposed Order authorize the Debtors to pay the Payable Claims (i) on the condition that by accepting payment, the Prepetition Creditor agrees to maintain or reinstate trade terms during the pendency of these chapter 11 cases that are at least as favorable as those existing on or prior to the Commencement Date or (ii) on terms satisfactory to the Debtors in their business judgment. The Debtors also propose that if a Prepetition Creditor, after receiving a payment on account of its prepetition claim, does not maintain or reinstate trade terms at least as favorable as those existing on or prior to the Commencement Date during the pendency of these chapter 11 cases, or does not maintain terms agreed to by the Debtors, then any payments made on account of the Payable Claims to such

---

[3] Certain of the Debtors' prepetition trade creditors, such as shippers and mechanics, may be secured creditors because of their right to assert liens on the Debtors' property.

Prepetition Creditor after the Commencement Date may, solely in the Debtors' discretion, either be (i) deemed applied to postpetition amounts payable to such Prepetition Creditor or (ii) treated as an unauthorized postpetition transfer recoverable by the Debtors upon a motion by the Debtors to enforce the terms requested herein.

## The Payable Claims

21.     As described above, the Debtors have solicited from certain of their creditors acceptance of the Prepackaged Plan. Under the Prepackaged Plan, Nortek General Unsecured Claims and Nortek Other Secured Claims are unimpaired, and the holders of such claims will receive payment in full, in cash. In their Disclosure Statement, the Debtors indicated their intention to seek authority to pay their Prepetition Creditors in the ordinary course of business to protect their relations with trade creditors. Disclosure Statement § IV(B) p.31-32. In light of the support of the Debtors' major creditor constituencies for the Prepackaged Plan, the Debtors seek authority to pay Prepetition Creditors, in the ordinary course of business, amounts that they will be entitled to receive upon consummation of the Prepackaged Plan.

22.     In the ordinary course of their businesses, the Debtors incur numerous obligations to vendors that provide, among other things, vital supplies and services necessary to the Debtors' production and maintenance processes, telecommunications services, utility services, professional services (including experts and engineers), shipping services, equipment and other goods and services necessary to operate the Debtors' businesses. Included in the Payables Claims are obligations that the Debtors also incur, in the ordinary course of their businesses, to third-party non-employee independent sales representatives ("**Sales Reps**") who are responsible for marketing and selling products manufactured by certain segments of the Debtors' businesses, such as Commercial HVAC, HTP and Residential HVAC. Many of the

Sales Reps have technical expertise in the fields of engineering and architecture, and, due to their specialized knowledge, are the Debtors' primary contacts with their customers. Additionally, the Payables Claims include obligations that the Debtors incur, in the ordinary course of their businesses, in respect of programs whereby the Debtors pay companies like Westinghouse Electric Corporation, White Consolidated Industries, and Maytag Corporation certain royalties to market products manufactured by the Debtors under brand names such as Frigidaire®, Tappan®, Philco®, Kelvinator®, Gibson®, Westinghouse®, and Maytag® (the "*Royalty Programs*"). Without the authority to pay the amounts owed under the Royalty Programs, the Debtors would not be able to ship finished products marketed under those brand names.

23.     Allowing the payment of the Payable Claims on the terms set forth herein will allow for a smooth reorganization in these prepackaged cases. The Debtors estimate that, as of the Commencement Date, they owe a total of approximately $93,500,000 on account of undisputed Payable Claims.[4] Of those claims, the Debtors estimate that approximately $23,500,000 would also be entitled to administrative priority status pursuant to section 503(b)(9) of the Bankruptcy Code because they relate to goods delivered to the Debtors in the ordinary course of business within twenty (20) days of the Commencement Date. Furthermore, $645,000 of the Payable Claims may be secured. Approximately $390,000 of the Payable Claims arise from capital projects with vendors that may be able to assert mechanics liens on the Debtors' property and not less than $4,850,000 arise from shippers who may be able to assert possessory

---

[4] This figure does not include the value of goods in transit and not received by the Debtors as of the Commencement Date because amounts due for such goods will be paid in the ordinary course as administrative expense priority claims. This figure includes amounts paid by Debtors to non-Debtors, but does not include intercompany payments among Debtors, and intercompany payments among Debtors will not count against the cap.

liens on the Debtor's property. Approximately $3,100,000[5] of the Payable Claims arise from Sales Broker commission obligations and $3,900,000 from the Royalty Programs. The Debtors estimate that approximately $56,700,000 of Payable Claims will become due and payable within the first twenty (20) days of these chapter 11 cases.

## Payment of the Payable Claims is Warranted

24. The Debtors believe that the relief requested is reasonable and necessary under the circumstances. The Debtors seek to pay the Payable Claims in the ordinary course of business to ensure uninterrupted operations and to allow for a seamless transition through these chapter 11 cases. The Debtors' ability to maintain and develop their relationships with essential Sales Reps who generate valuable business, those companies who allow the Debtors to market products under the Royalty Programs and vendors that supply goods to the Debtors in the ordinary course of the Debtors' businesses is essential to minimize disruption to the Debtors' operations during these chapter 11 cases and preserve their enterprise value for the benefit of all parties in interest.

25. Absent continuity of payment of the Payable Claims in the ordinary course of business, the Debtors' businesses will be harmed. The Debtors' inability to maintain existing terms with vendors could cause production disruptions if suppliers were to cease providing goods and services even for a short period of time, imperiling the Debtors' restructuring efforts and damaging the goodwill of their customers. The nature of the Debtors' businesses – the manufacture and distribution of products used in commercial and residential buildings – is such

---

[5] This figure does not include profits earned by certain sales representatives in transactions where the Commercial HVAC segment sells products at a discounted price directly to a sales representative who then re-sells the product to an end user at a retail mark-up.

that delay would be unacceptable, especially in the current economic environment. The Debtors cannot risk alienating or losing valuable customers during this period.

26. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). "Under 11 U.S.C. § 105, the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor." In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing Ionosphere Clubs, 98 B.R. at 177). The uninterrupted supply of goods and services on current trade terms, the continuing support of their vendors, and the continuing marketing of the Debtors' products via a strong and loyal team of Sales Reps are imperative to the ongoing operations and viability of the Debtors. Accordingly, the relief requested herein is consistent with the paramount goal of chapter 11 – "facilitating the continued operation and rehabilitation of the debtor . . . ." Ionosphere Clubs, 98 B.R. at 176.

27. The Court may also authorize the Debtors' payment of the Payable Claims pursuant to section 363(b) of the Bankruptcy Code. Section 363(b)(1) authorizes courts, after notice and hearing, to permit a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); see also Ionosphere Clubs, 98 B.R. at 175 ("Section 363(b) gives the court broad flexibility in tailoring its orders to meet a wide variety of circumstances."). For a court to apply section 363(b), the debtor must "articulate some business justification, other than mere appeasement of major creditors . . . ." Id. (ruling that the

debtor's payment of prepetition claims was necessary to protect its business and to ensure a successful reorganization).

28.     The Debtors submit that payment of Payable Claims is necessary and appropriate, and authorized under sections 105(a) and 363(b) of the Bankruptcy Code pursuant to the "doctrine of necessity." The "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein. See In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to continued operation of the debtor); Ionosphere Clubs, 98 B.R. at 176 (authorizing the payment of prepetition employee wages and benefits while noting the judicial power to "authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor."); see also In re Just for Feet, Inc., 242 B.R. 821, 824-25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for the payment of pre-petition claims" under the doctrine of necessity and noting that the Supreme Court, the United States Circuit Court of Appeals for the Third Circuit, and the District Court of Delaware all accept the authority of the bankruptcy court "to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11."); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan). Accordingly, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, this Court is empowered to grant the relief requested herein.

29.     The relief sought is necessary to the Debtors' successful reorganization because it enables the Debtors to focus on consummating the Prepackaged Plan for the benefit of the Debtors, their estates, and their creditors. The Debtors' major creditor constituents have reached agreement on a reorganization plan. Now, the paramount goal of parties in interest is to protect the value of the Debtors' businesses during the pendency of these chapter 11 cases by preventing operational disruptions. The relief requested herein preserves the value of the Debtors' estates by (i) ensuring that the Debtors have access to the goods and services that they need to remain stable and (ii) enabling the Debtors to maintain good relationships with their trade creditors and Sales Reps for the benefit of the reorganized debtors when they emerge from chapter 11.

30.     Paying the Prepetition Creditors in the ordinary course of business further minimizes disruption to the Debtors' operations by preventing the initiation of reclamation claims, adversary proceedings and other motions filed by the Prepetition Creditors seeking payment of their prepetition claims, and ensuring Prepetition Creditors agree to continue supplying the Debtors postpetition under current trade terms. Maintaining current trade terms allows the Debtors to avoid the inherent operational inefficiencies of paying cash on demand and managing billing processes for numerous vendors that require cash in advance or shorten their trade terms to less than a week.

31.     The relief requested herein is appropriate because it spares the Debtors the expense and time required to analyze each Payable Claim to determine which amounts are payable as postpetition administrative expenses, which amounts are subject to administrative priority under section 503(b)(9), and which amounts should be held back until effectuation of the

Prepackaged Plan. Engaging in such a time-consuming analysis is unnecessary in light of the anticipated short duration of these chapter 11 cases.

32.    Moreover, because the relief requested is narrowly tailored to facilitate the Debtors' fast-tracked chapter 11 reorganization process, no parties in interest will be prejudiced by the relief requested herein. The Prepackaged Plan seeks to pay the Nortek General Unsecured Claims and Nortek Other Secured Claims in full, in cash. Pursuant to this Motion, the Debtors seek authority to pay only those undisputed amounts that come due in the ordinary course of their businesses and on terms consistent with their prepetition practices. Hence, the relief requested merely expedites the treatment and distribution that is already afforded to the Payable Claims held by Prepetition Creditors under the Prepackaged Plan. Under these circumstances, the Debtors submit that the requested relief is necessary and appropriate.

33.    In fact, courts have routinely authorized payment of prepetition claims in the context of prepackaged chapter 11 cases in this and other districts. See, e.g., In re Vertis Holdings, Inc., Ch. 11 Case No. 08-11460 (CSS) (Bankr. D. Del. July 16, 2008) [Docket No. 49]; In re Hilex Poly Co. LLC, Ch. 11 Case No. 08-10890 (KJC) (Bankr. D. Del. May 7, 2008) [Docket No. 37]; In re Holley Performance Prods., Inc., Ch. 11 Case No. 08-10256 (PJW) (Bankr. D. Del. Mar. 5, 2008) [Docket No. 107]; In re DJK Residential LLC, Ch. 11 Case No. 08-10375 (JMP) (Bankr. S.D.N.Y. Feb. 5, 2008) [Docket No. 47].[6]

34.    In addition, in other large, traditional chapter 11 cases, courts have authorized the payment of unsecured prepetition claims – even when no plan has been proposed or where a proposed plan impairs general unsecured claims – pursuant to the "necessity of

---

[6] In fact, the Bankruptcy Court for the Southern District of New York has incorporated a motion to pay prepetition claims of creditors whose claims will be paid in full in its prepackaged bankruptcy guidelines for first-day motions. S.D.N.Y. General Order 203 § VI.C.16.

payment" doctrine. See, e.g., In re Leiner Health Prods. Inc., Ch. 11 Case No. 08-10446 (KJC) (Bankr. D. Del. Apr. 8, 2008) [Docket No. 191] (final order authorizing payment of critical vendors, including critical vendors with section 503(b)(9) claims); In re Buffets Holdings, Inc., Ch. 11 Case No. 08-10141 (MFW) (Bankr. D. Del. Feb. 13, 2008) [Docket Nos. 284, 287] (two final orders, one authorizing payment of section 503(b)(9) claims at the outset of the case and the other authorizing payment of critical vendor claims at the outset of the case). Accordingly, the Court should grant this Motion.

### Reservation of Rights

35.     Nothing contained herein is intended or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any party in interest's rights to dispute any claim under applicable nonbankruptcy law, or (iii) an assumption, adoption, or rejection of any agreement, contract, program, policy or lease between the Debtors and any third party under section 365 of the Bankruptcy Code. Likewise, if this Court grants the relief sought herein, (i) the Debtors will not be required to make any of the payments authorized herein, and (ii) any payment made pursuant to the Court's order is not intended and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently. Finally, the relief requested herein shall not oblige the Debtors to accept any services, to accept the shipment of goods, or prevent the Debtors from returning or rejecting goods.

### Request for Authority for Banks to Honor and Pay Checks Issued and Electronic Funds Transfers Requested to Pay Prepetition Creditors

36.     As part of their cash management system, the Debtors maintain disbursement accounts (collectively, the "***Disbursement Accounts***") at various banks and other financial institutions (collectively, the "***Banks***"). The Debtors draw upon funds in their

Disbursement Accounts to satisfy obligations arising from the Payable Claims. The Debtors

request that the Court authorize and direct the Banks and any other applicable financial

institutions to receive, process, honor and pay any and all checks drawn or electronic funds

transferred to pay the Payable Claims, whether such checks were presented prior to or after the

Commencement Date. The Debtors also seek authority to issue new postpetition checks, or

effect new electronic funds transfers, on account of such claims to replace any prepetition checks

or electronic funds transfer requests that may be dishonored or rejected as a result of the

commencement of the Debtors' chapter 11 cases. The Debtors submit that they have sufficient

liquidity to pay such amounts as they become due in the ordinary course of the Debtors'

businesses.

## The Debtors Have Satisfied Bankruptcy Rule 6003

      37.    Bankruptcy Rule 6003 provides that to the extent "relief is necessary to

avoid immediate and irreparable harm," a Bankruptcy Court may approve a motion to "pay all or

part of a claim that arose before the filing of the petition" prior to twenty days after the

Commencement Date. As described herein and in the Bready Declaration, the Debtors' business

operations require the uninterrupted provision of goods and services from the Prepetition

Creditors. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid

immediate and irreparable harm, and, therefore, the requirements of Bankruptcy Rule 6003 for

expedited relief are satisfied.

## The Relief Requested is Appropriate

      38.    The requested relief is further supported by the prepackaged nature of

these cases. As set forth above and in greater detail in the Bready Declaration, the Debtors

solicited votes on the Prepackaged Plan from all classes of holders of claims entitled to vote to

accept or reject the Prepackaged Plan. The votes tabulated and received from these classes

demonstrate acceptance of the Prepackaged Plan. The most critical and complex task required to effectuate a successful reorganization – the negotiation and formulation of a chapter 11 plan of reorganization – has already been accomplished. Thus, the Debtors respectfully submit that given the backdrop of these cases, the relief requested herein is appropriate inasmuch as such relief will assist the Debtors to move towards expeditious confirmation of the widely-supported Prepackaged Plan with the least possible disruption or harm to their businesses. Moreover, the relief requested is supported by the Debtors' major creditor groups. Based on the foregoing, the Debtors submit that the relief requested is necessary and appropriate, is in the best interests of their estates and creditors, and should be granted in all respects.

### Notice

39.     No trustee, examiner or statutory creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion shall be provided to: (i) the United States Trustee for the District of Delaware; (ii) the Debtors' thirty (30) largest unsecured creditors (on a consolidated basis); (iii) counsel for the Ad Hoc Committee, Paul, Weiss, Rifkind, Wharton & Garrison LLP (attn: Andrew N. Rosenberg, Lawrence G. Wee, and Brian S. Hermann) and Young Conaway Stargatt & Taylor, LLP (attn: Pauline K. Morgan); (iv) Goldman Sachs Credit Partners L.P. as agent under the Bridge Loan (attn: Andrew Caditz, Philip F. Green, Jaime Weisfelner, and Pedro Ramirez); (v) counsel for Goldman Sachs Credit Partners L.P., Cravath, Swaine & Moore LLP (attn: George Stephanakis); (vi) Bank of America, N.A. as agent under the ABL Facility (attn: Timothy A. Clarke and Richard M. Levensen); (vii) counsel for Bank of America, N.A., Shearman & Sterling LLP (attn: James L. Garrity and Susan A. Fennessey) and Potter Anderson & Corroon LLP (attn: Laurie Selber Silverstein); (viii) counsel for U.S. Bank N.A. as indenture trustee under the 10% Notes, the 8 ½% Notes, the 9 ⅞% Notes, and the NTK 10 ¾% Notes, Loeb & Loeb LLP (attn: Walter H. Curchack); and (ix) counsel for the Ad Hoc

Group of 10% Noteholders (as defined in the Prepackaged Plan), Akin Gump Strauss Hauer & Feld LLP (attn: Michael S. Stamer and Philip C. Dublin). The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

## No Previous Request

40.     No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as is just and proper.

Dated: October 21, 2009
       Wilmington, Delaware

                                        */s/*
                                          _____
                                          Mark D. Collins (No. 2981)
                                          Paul N. Heath (No. 3704)
                                          Chun I. Jang (No. 4790)

Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Chun I. Jang (No. 4790)
Drew G. Sloan (No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

        – and –

Gary T. Holtzer
Stephen A. Youngman
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Proposed Attorneys for Debtors
and Debtors in Possession

**Exhibit A**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

---------------------------------------------------------------x
                            :

*In re*                          :        **Chapter 11**
                            :

**NTK HOLDINGS, INC.,** *et al.,*[1]    :        **Case No. 09 – 13611 (  )**
                            :

        **Debtors.**           :        **(Jointly Administered)**
                            :

---------------------------------------------------------------x

## ORDER PURSUANT TO SECTIONS
## 105(a) AND 363(b) OF THE BANKRUPTCY CODE FOR
## AUTHORIZATION TO PAY PREPETITION CLAIMS OF
## CERTAIN CREDITORS IN THE ORDINARY COURSE OF BUSINESS

Upon the motion (the "***Motion***"), dated October 21, 2009, of NTK Holdings, Inc.

and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter

11 cases (collectively, the "***Debtors***"), pursuant to sections 105(a) and 363(b) of the Bankruptcy

Code,[2] authorizing, but not directing the Debtors to pay certain prepetition creditors in the

ordinary course of business, all as more fully described in the Motion; and upon consideration of

the *Declaration of Richard L. Bready in Support of the Debtors' Chapter 11 Petitions and*

*Request for First Day Relief* (the "***Bready Declaration***"); and consideration of the Motion and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: NTK Holdings, Inc. (4298); Nortek Holdings, Inc. (9907); Nortek, Inc. (4991); Aigis Mechtronics, Inc. (6764); Broan-Mexico Holdings, Inc. (1438); Broan-NuTone LLC (4397); Broan-NuTone Storage Solutions LP (4328); CES Group, Inc. (5781); CES International Ltd. (6119); Cleanpak International, Inc. (2925); Elan Home Systems, L.L.C. (7629); Gefen, Inc. (1217); Governair Corporation (1240); GTO, Inc. (6645); HC Installations, Inc. (0110); Huntair, Inc. (2838); International Electronics, LLC (4321); Linear LLC (9070); Linear H.K. LLC (9638); Lite Touch, Inc. (0152); Magenta Research Ltd. (5160); Mammoth-Webco, Inc. (3077); Niles Audio Corporation (2001); Nordyne Inc. (4381); NORDYNE International, Inc. (7842); Nortek International, Inc. (0717); NuTone LLC (9551); OmniMount Systems, Inc. (7936); Operator Specialty Company, Inc. (6248); Pacific Zephyr Range Hood, Inc. (8936); Panamax Inc. (0890); Rangaire GP, Inc. (4327); Rangaire LP, Inc. (9900); Secure Wireless, Inc. (2485); SpeakerCraft, Inc. (6374); Temtrol, Inc. (3996); Xantech Corporation (1552); and Zephyr Corporation (1650). The Debtors' principal offices are located at 50 Kennedy Plaza, Suite 1900, Providence, Rhode Island 02903. The addresses for all of the Debtors are available at the website chapter11.epiqsystems.com/nortek.

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

the relief requested therein a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334; and due and proper notice of the hearing to consider the relief requested

therein (the "*Hearing*") having been provided to: (i) the United States Trustee for the District of

Delaware; (ii) the Debtors' thirty (30) largest unsecured creditors (on a consolidated basis); (iii)

counsel for the Ad Hoc Committee, Paul, Weiss, Rifkind, Wharton & Garrison LLP (attn:

Andrew N. Rosenberg, Lawrence G. Wee, and Brian S. Hermann) and Young Conaway Stargatt

& Taylor, LLP (attn: Pauline K. Morgan); (iv) Goldman Sachs Credit Partners L.P. as agent

under the Bridge Loan (attn: Andrew Caditz, Philip F. Green, Jaime Weisfelner, and Pedro

Ramirez); (v) counsel for Goldman Sachs Credit Partners L.P., Cravath, Swaine & Moore LLP

(attn: George Stephanakis); (vi) Bank of America, N.A. as agent under the ABL Facility (attn:

Timothy A. Clarke and Richard M. Levensen); (vii) counsel for Bank of America, N.A.,

Shearman & Sterling LLP (attn: James L. Garrity and Susan A. Fennessey) and Potter Anderson

& Corroon LLP (attn: Laurie Selber Silverstein); (viii) counsel for U.S. Bank N.A. as indenture

trustee under the 10% Notes, the 8 ½% Notes, the 9 ⅞% Notes, and the NTK 10 ¾% Notes,

Loeb & Loeb LLP (attn: Walter H. Curchack); and (ix) counsel for the Ad Hoc Group of 10%

Noteholders (as defined in the Prepackaged Plan), Akin Gump Strauss Hauer & Feld LLP (attn:

Michael S. Stamer and Philip C. Dublin) (collectively, the "*Notice Parties*"), and no further

notice being necessary; and the legal and factual bases set forth in the Motion establishing just

and sufficient cause to grant the relief requested therein; and the relief granted herein being in the

best interests of the Debtors, their estates, creditors, and all parties in interest; and the Court

having held the Hearing with the appearances of interested parties noted in the record of the Hearing; and upon all of the proceedings before the Court, the Court hereby ORDERS that:

1.      The Motion is granted to the extent set forth herein.

2.      Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors are authorized, but not directed, to pay the liquidated, noncontingent, and undisputed prepetition amounts owed to Prepetition Creditors on account of the Payable Claims consistent with the terms of such obligations existing on the date of the commencement of these cases (the "***Commencement Date***"), with past practice or on terms satisfactory to the Debtors in their business judgment, provided, however, that if any such Prepetition Creditor refuses to continue to supply goods and services to the Debtors during the pendency of these cases on trade terms that are at least as favorable as those existing on or prior to the Commencement Date, consistent with past practice or on terms satisfactory to the Debtors in their business judgment, the Debtors may obtain the relief provided in paragraph 4 below.

3.      Payments made to the Debtors' Prepetition Creditors pursuant to this Order shall not exceed the sum of $108,400,000 in the aggregate without further Order of this Court; provided, however, that intercompany payments among Debtors will not be counted against the cap.

4.      In the event that a Prepetition Creditor does not maintain or reinstate trade terms that are at least as favorable as those existing on or prior to the Commencement Date or consistent with past practice during the pendency of these cases, or does not maintain trade terms agreed to by the Debtors, any payments made pursuant to this Order after the Commencement Date shall be, in the Debtors' sole discretion and subject to the rights of all parties in interest, either (i) deemed applied to postpetition amounts payable to such Prepetition Creditor or (ii)

recoverable by the Debtors as unauthorized postpetition transfers under section 549 of the Bankruptcy Code or other applicable bankruptcy or non-bankruptcy law.

5.     During the pendency of these cases, the Debtors are only authorized to pay those Payable Claims that (i) were, as of the Commencement Date, due and owing or (ii) become due and owing (without regard to any acceleration of payment arising as a result of the commencement of these chapter 11 cases).

6.     The undisputed obligations of the Debtors for goods and services received by the Debtor after the Commencement Date shall be afforded administrative expense priority status pursuant to section 503(b) of the Bankruptcy Code and are not Payable Claims addressed by this Order.

7.     The Debtors' banks or other financial institutions are authorized and directed to process, honor, and pay any checks drawn or electronic funds transfers requested on the Debtors' account to pay the Payable Claims, and the costs and expenses incident thereto, whether those checks or electronic funds transfer requests were presented prior to or after the Commencement Date, provided however, that such checks or electronic funds transfers are identified by the Debtors as relating directly to the authorized payment of the Payable Claims authorized to be paid pursuant to this Order, in each case solely to the extent that there exist sufficient funds to make such payments or other transfers; provided that in no event shall any such bank or other financial institution that takes any such action either (i) at the direction of the Debtors, (ii) in good faith belief that the Court has authorized such action consistent with the implementation of reasonable item handling procedures, or (iii) as a result of an innocent mistake made despite the implementation of reasonable item handling procedures, be deemed in violation of this Order or have liability in connection therewith.

8.     The Debtors are authorized to issue replacement checks, resubmit electronic funds transfer requests, or otherwise make payment to any Prepetition Creditor on account of the Payable Claims authorized to be paid pursuant to this Order without the need for further Court approval.

9.     Nothing herein constitutes (i) an admission as to the validity of any claim against the Debtors or (ii) a waiver of the Debtors' or any party in interest's rights to subsequently dispute any of the Payable Claims under applicable nonbankruptcy law.

10.     Nothing contained in the Motion or in this Order (i) constitutes an assumption, adoption, or rejection of any executory contract or agreement between the Debtors and any third party or (ii) requires the Debtors to make any of the payments authorized herein.

11.     Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") has been satisfied because the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors.

12.     The Debtors shall serve this Order within three (3) business days of its entry on the parties in interest identified in Local Rule 2002-1(b), including the Notice Parties.

13.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: October ___, 2009
      Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE