-----------------------------------------------------------x

In re                           :       **Chapter 11**

NTK HOLDINGS, INC., *et al.*,[1]    :       **Case No. 09 – _____ (   )**

         **Debtors.**            :       **(Jointly Administered)**

-----------------------------------------------------------x

## DECLARATION OF RICHARD L. BREADY IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUEST FOR FIRST DAY RELIEF

I, Richard L. Bready, being fully sworn, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.     I am the Chief Executive Officer of NTK Holdings, Inc. ("***NTK Holdings***"), a Delaware corporation and the parent company of the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "***Debtors***" and together with their non-debtor affiliates, "***Nortek***"). I am also the Chief Executive Officer of Nortek Holdings, Inc. and Nortek, Inc., and a named officer of each of the other Debtors. I have been employed by Nortek since 1975, and as Chief Executive Officer since 1990. In my current capacity, I am familiar with the day-to-day operations, businesses, and financial affairs of each of the Debtors.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: NTK Holdings, Inc. (4298); Nortek Holdings, Inc. (9907); Nortek, Inc. (4991); Aigis Mechtronics, Inc. (6764); Broan-Mexico Holdings, Inc. (1438); Broan-NuTone LLC (4397); Broan-NuTone Storage Solutions LP (4328); CES Group, Inc. (5781); CES International Ltd. (6119); Cleanpak International, Inc. (2925); Elan Home Systems, L.L.C. (7629); Gefen, Inc. (1217); Governair Corporation (1240); GTO, Inc. (6645); HC Installations, Inc. (0110); Huntair, Inc. (2838); International Electronics, LLC (4321); Linear LLC (9070); Linear H.K. LLC (9638); Lite Touch, Inc. (0152); Magenta Research Ltd. (5160); Mammoth-Webco, Inc. (3077); Niles Audio Corporation (2001); Nordyne Inc. (4381); NORDYNE International, Inc. (7842); Nortek International, Inc. (0717); NuTone LLC (9551); OmniMount Systems, Inc. (7936); Operator Specialty Company, Inc. (6248); Pacific Zephyr Range Hood, Inc. (8936); Panamax Inc. (0890); Rangaire GP, Inc. (4327); Rangaire LP, Inc. (9900); Secure Wireless, Inc. (2485); SpeakerCraft, Inc. (6374); Temtrol, Inc. (3996); Xantech Corporation (1552); and Zephyr Corporation (1650). The Debtors' principal offices are located at 50 Kennedy Plaza, Suite 1900, Providence, Rhode Island 02903. The addresses for all of the Debtors are available at the website chapter11.epiqsystems.com/nortek.

2.     I submit this declaration (the "***Declaration***") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of (i) the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") filed on the date hereof (the "***Commencement Date***") and (ii) the relief, in the form of motions, that the Debtors have requested of the Court (the "***First Day Motions***"). Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion.

3.     Prior to the Commencement Date, the Debtors solicited votes on the Joint Prepackaged Plans of Reorganization of NTK Holdings, Inc., *et al.* (the "***Prepackaged Plan***") through a disclosure statement distributed in accordance with sections 1125 and 1126(b) of the Bankruptcy Code (the "***Disclosure Statement***"). As discussed more fully below, the Prepackaged Plan has been accepted by all but one of the impaired classes entitled to vote in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code.

4.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' senior management and the Debtors' advisors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

5.     This Declaration is intended to provide a summary overview of the Debtors and these chapter 11 cases. Sections I through IV of this Declaration provide a description of the Debtors' businesses, corporate history and organizational structure, capital structure, and the circumstances giving rise to the commencement of these chapter 11 cases.

Section V summarizes the Prepackaged Plan and Section VI summarizes the First Day Motions and the relief they seek, which the Debtors believe is crucial to their successful reorganization.

## I.

### Nortek's Businesses

6.     Nortek (through its wholly-owned subsidiaries) is a diversified manufacturer and distributor of innovative, high-quality and competitively-priced building products for residential, light commercial and commercial applications. Nortek's products are designed to meet the needs of professionals in the new construction and remodeling markets as well as individual contractors, wholesalers and do-it-yourself customers around the world.

7.     Nortek operates within four (4) business segments: the Residential Ventilation Products ("*RVP*") segment, the Home Technology Products ("*HTP*") segment, the Residential Air Conditioning and Heating Products ("*Residential HVAC*") segment, and the Commercial Air Conditioning and Heating Products ("*Commercial HVAC*") segment. Through these segments, Nortek manufactures and sells its products primarily to customers throughout the United States, Canada and Europe.

8.     The RVP segment manufactures and distributes room and whole-house ventilation products and other products primarily for the professional remodeling and replacement markets, residential new construction market and do-it-yourself market. The principal products of the segment, which are sold under the Broan®, NuTone®, Venmar®, Best®, and Zephyr® brand names, among others, are: (i) kitchen range hoods, (ii) exhaust fans (such as bath fans and fan, heater and light combination units), and (iii) indoor air quality products. Nortek is one of the world's largest suppliers of residential range hoods and exhaust fans, and is the largest supplier of these products in North America.

9.     The HTP segment manufactures and distributes a broad array of products designed to provide convenience and security for residential and certain commercial applications. The principal products of the segment, which are sold under the Niles®, Elan®, HomeLogic®, SpeakerCraft®, Proficient Audio Systems®, Sunfire®, Xantech®, Channel Plus®, Linear®, Mighty Mule®, OSCO®, Aigis®, Open House®, Magenta™, LiteTouch®, and Gefen® brand names, are: (i) audio/video distribution and control equipment, speakers, subwoofers, audio/video wall mounts and fixtures, (ii) security and access control products, (iii) power conditioners and surge protectors, (iv) lighting and home automation controls, and (v) structured wiring. Nortek sells the products in its HTP segment to distributors, professional installers, electronics retailers, and original equipment manufacturers. Sales in this segment are primarily driven by replacement applications, new installations in existing properties and the purchase of high-priced audio/video equipment such as flat panel televisions and displays.

10.     The Residential HVAC segment principally manufactures and sells split-system air conditioners, heat pumps, air handlers, furnaces and related equipment, accessories and parts for the residential and certain commercial markets. For site-built homes and certain commercial structures, the segment markets its products under the licensed brand names Frigidaire®, Tappan®, Philco®, Kelvinator®, Gibson®, Westinghouse®, Broan®, Nutone®, and Maytag®. Within the residential market, Nortek is one of the largest suppliers of HVAC products for manufactured homes in the United States and Canada under the brand names Miller® and Intertherm®.

11.     The Commercial HVAC segment manufactures and sells HVAC systems that are custom-designed to meet customer specifications for commercial offices, manufacturing and educational facilities, hospitals, retail stores, clean rooms and governmental buildings.

These systems are designed primarily to operate on building rooftops, or on individual floors within a building, and to have cooling capacities. The segment markets its commercial HVAC products under the Governair®, Mammoth®, Temtrol®, Venmar CES™, Ventrol®, Webco®, Huntair®, Cleanpak™, and Fanwall® brand names. Nortek is one of the largest suppliers of custom-designed commercial HVAC products in the United States.

## II.

## Corporate History and Organizational Structure

12.     NTK Holdings owns all of the outstanding capital stock of Nortek Holdings, Inc., which, in turn, owns all of the outstanding capital stock of Nortek, Inc. NTK Holdings has no assets other than its shares in Nortek Holdings, Inc. and it does not conduct any operations other than with respect to its ownership in Nortek Holdings, Inc.

13.     Nortek, Inc. was incorporated in Delaware in 1986. On November 20, 2002, Nortek, Inc. reorganized into a holding company structure and each outstanding share of capital stock of Nortek, Inc. was converted into an identical share of capital stock of Nortek Holdings, Inc. (the "*former Nortek Holdings*"), a Delaware corporation formed in 2002, with the former Nortek Holdings becoming the successor public company and Nortek, Inc. becoming a wholly-owned subsidiary of the former Nortek Holdings.

14.     On January 9, 2003, the former Nortek Holdings was acquired by certain affiliates and designees of Kelso & Company L.P. ("*Kelso*") and certain members of Nortek, Inc.'s management. As a result, Nortek, Inc.'s shares of capital stock are no longer publicly traded, although Nortek, Inc. continues to file periodic reports with the SEC as a "voluntary filer" in accordance with the requirements of certain of its debt documents.

15.     On July 15, 2004, THL Buildco Holdings, Inc. ("*THL Buildco Holdings*") and THL Buildco, Inc. ("*THL Buildco*"), newly formed Delaware corporations affiliated with

Thomas H. Lee Partners L.P., entered into a stock purchase agreement with the owners of the former Nortek Holdings, including affiliates of Kelso, and certain members of Nortek, Inc.'s management, pursuant to which THL Buildco agreed to purchase all of the outstanding capital stock of the former Nortek Holdings.

16.     On August 27, 2004, THL Buildco purchased all of the outstanding capital stock of the former Nortek Holdings. Immediately upon the completion of this acquisition, THL Buildco was merged with and into the former Nortek Holdings, with the former Nortek Holdings continuing as the surviving corporation. The former Nortek Holdings was then merged with and into Nortek, Inc. with Nortek, Inc. continuing as the surviving corporation and a wholly-owned subsidiary of THL Buildco Holdings. THL Buildco Holdings was then renamed Nortek Holdings, Inc. ("*Nortek Holdings*"). Nortek Holdings is wholly-owned by NTK Holdings, which is wholly owned by THL-Nortek Investors, LLC, a Delaware limited liability company ("*Investors LLC*"). As of September 1, 2009, there were 3,000 shares of common stock of Nortek, Inc. authorized and outstanding, all of which are owned by Nortek Holdings.

17.     The chart on the following page summarizes the Debtors' corporate structure.

October 4, 2009



(1) Broan Building Products-Mexico, S. de R.L. de C.V. is 99.99% owned by Broan-Mexico Holdings, Inc. and .01% owned by Nortek International, Inc.
(2) Miller de Mexico is 99% owned by NORDYNE International, Inc. and 1% by Mordyne Inc.
(3) Nortek International, Inc. is 72% owned by Nortek, Inc. and 28% owned by Linear LLC.
(4) Linear H.K. LLC owns 1 nominal share of Linear HK Manufacturing Limited
(5) Combi Parts Srl. is 99% owned by Best S.P.A. and 1% owned by Nortek (UK) Limited
(6) Broan-NuTone LLC is 10% owned by Nortek, Inc. and 90% owned by Linear LLC
(7) Broan-NuTone Storage Solutions LP is 99% owned by Rangaire LP, Inc. and 1% owned by Rangaire GP, Inc.

Shading indicates operating entity.

7

18.     As of the Commencement Date, the Debtors had approximately 4,534 employees in North America and the Debtors' and their non-debtor subsidiaries' unaudited consolidated financial statements reflected $926,800,000 of net sales for the 6-month period ended July 4, 2009. As of July 4, 2009, Debtors and their non-debtor subsidiaries had total assets of approximately $1,655,200,000 and total liabilities of approximately $2,778,100,000.

## III.

### Prepetition Indebtedness and Capital Structure

19.     There is no established public trading market for Nortek, Inc.'s capital stock. As of September 1, 2009, there were 3,000 shares of common stock of Nortek, Inc. authorized and outstanding, all of which are owned by Nortek Holdings. As noted earlier, Nortek Holdings is a wholly-owned direct subsidiary of NTK Holdings, which, in turn, is a wholly-owned direct subsidiary of Investors LLC. The outstanding membership interests of Investors LLC consist of 473,595.10 voting Class B units, 64,013.54 non-voting Class C units and 4,228 non-voting Class D units. The Class C units are divided into two series: Class C-1 time-vesting units and Class C-2 performance-vesting units. Thomas H. Lee Partners, L.P. and certain of its affiliates maintain the position of controlling shareholder of NTK Holdings.

A.     **Nortek Notes**

20.     Nortek is the issuer of: (i) approximately $750 million aggregate principal amount outstanding of the 10% Senior Secured Notes (the "*10% Notes*," and the holders thereof, the "*10% Noteholders*"), issued pursuant to an indenture dated as of May 20, 2008 and due on June 1, 2013 (as amended from time to time, the "*10% Indenture*"), secured by a first priority lien on substantially all of Nortek's and its domestic subsidiaries' tangible and intangible assets, except those assets securing Nortek's five-year $350 million senior secured asset-based revolving credit facility (the "*ABL Facility*") on a first-priority basis; (ii) approximately $625

million aggregate principal amount outstanding of the 8 ½% Senior Subordinated Notes Notes (the "*8 ½% Notes*," and the holders thereof, the "*8 ½% Noteholders*"), issued pursuant to an indenture dated as of August 27, 2004 and due on September 1, 2014 (as amended from time to time, the "*8 ½% Indenture*"); and (iii) approximately $10 million aggregate principal amount outstanding of the 9 ⅞% Senior Subordinated Notes (the "*9 ⅞% Notes*," issued pursuant to an indenture dated as of June 12, 2001 and due on June 12, 2010 (as amended from time to time, the "*9 ⅞% Indenture*"). Each of the Debtors other than NTK Holdings, Nortek Holdings, and Nortek, Inc. (collectively, the "*Subsidiary Debtors*") have guaranteed repayment of each of the 10% Notes and the 8 ½% Notes.

B.    **The ABL Facility**

21.    Pursuant to that certain Credit Agreement dated as of May 20, 2008 (as amended from time to time, the "*ABL Facility Agreement*"), Nortek replaced its $200 million revolving credit facility that was to mature on August 27, 2010 with the ABL Facility. The ABL Facility consists of a $330 million domestic facility (with a $60 million sublimit for the issuance of U.S. standby letters of credit and a $20 million sublimit for U.S. swingline loans) and a $20 million Canadian facility. Borrowings under the ABL Facility have a final maturity of May 20, 2013. The collateral for the ABL Facility consists of a first lien on all accounts receivable and inventory and a second lien on all other assets of Nortek and its domestic subsidiaries. The Subsidiary Debtors have guaranteed repayment of the $330 million domestic facility.

C.    **NTK 10 ¾% Notes**

22.    On February 15, 2005, NTK Holdings completed the sale of approximately $403 million aggregate principal amount at maturity of its 10 ¾% Senior Discount Notes due March 1, 2014 (the "*NTK 10 ¾% Notes*," and the holders thereof, the "*NTK*

*10 ¾% Noteholders*"). The NTK 10 ¾% Notes, which are structurally subordinate to all debt and liabilities of NTK Holdings' subsidiaries, including Nortek, Inc., were issued and sold in a private Rule 144A offering to institutional investors.

D.     **NTK Holdings Senior Unsecured Loan**

23.     Pursuant to that certain NTK Holdings Senior Unsecured Loan dated as of May 10, 2006 (the "*NTK Holdings Senior Unsecured Loan*"), NTK Holdings borrowed an aggregate principal amount of $205 million under a senior unsecured loan facility, by and among NTK Holdings, as borrower, Goldman Sachs Credit Partners L.P., as administrative agent and the lenders party thereto. The NTK Holdings Senior Unsecured Loan initially had a term of one year. However, on May 10, 2007, NTK Holdings exercised an option to extend the maturity date of its senior unsecured loan facility to March 1, 2014 and paid a loan extension fee of approximately $4.5 million. A portion of the proceeds was used to contribute capital of approximately $25.9 million to Nortek Holdings, which was used by Nortek Holdings, together with a dividend of approximately $28.1 million from Nortek, to make a distribution of approximately $54 million to participants in the 2004 Nortek Holdings Deferred Compensation Plan.

**IV.**

**Events Leading to the Chapter 11 Cases**

24.     The Debtors have substantial debt service obligations, including material principal payments, and have experienced decreased earnings due to a decline in revenues and contraction of margins in their core businesses. As further described in the Debtors' public filings, all of which are incorporated herein by reference, the Debtors' financial challenges result from trends in the home construction business, general macroeconomic conditions, unsustainable levels of debt, and other factors. The Debtors believe that the significance of these financial

challenges necessitates the restructuring of their outstanding debt. The Debtors believe that, by reducing their debt levels, the financial restructuring will provide greater value to their stakeholders than any alternative course of action.

A.     **Industry-Specific Events**

25.     The severity of the worldwide crisis in the credit and financial markets in the fourth quarter of 2008 and the first half of 2009, the instability in the troubled mortgage market, decreasing home values, rising unemployment and lower consumer disposable income all have had a negative impact on residential new construction activity and spending on home remodeling and repair projects, which has had a negative impact on the Debtors' operating results. Total housing starts in the United States declined 25% in 2007 over 2006, further declined 33% in 2008 and by 48% in the first half of 2009. U.S. private residential construction spending (including home improvement spending) declined by 20% in 2007, 29% in 2008 and 33% for the first six months of 2009. In addition, industry central air conditioning and heat pump shipments declined 18% in 2006, 9% in 2007, a further 9% in 2008 and 15% in the first half of 2009. These factors also have had an adverse effect on the Debtors' operating results, which is expected to continue for the duration of 2009.

B.     **The Debtors' Indebtedness Obligations and Liquidity Constraints**

26.     As of July 4, 2009, the Debtors and their foreign subsidiaries had cash and cash equivalents of $172.8 million and Excess Availability (as defined in the ABL Facility Agreement) under the ABL Facility of approximately $75 million. Based on the Debtors' EBITDA over the last 12 months, the Debtors and their foreign subsidiaries had a total leverage ratio of 15.9x and a cash interest coverage ratio of 1.0x, as of July 4, 2009.

27.     As a result of their highly levered capital structure, the Debtors have substantial debt service obligations, and particularly significant near-term obligations in 2010. Under the terms of the NTK 10 ¾% Notes, NTK Holdings would be required to make a payment of $147.4 million on March 1, 2010. In its 10-Q filing for the quarter ended April 4, 2009, NTK Holdings expressed its belief that there was a substantial likelihood that it would not be able to make its payments in 2010, including the payment due in March 2010. Additionally, on September 1, 2009, a $26.6 million interest payment was due from Nortek, Inc. to the 8 ½% Noteholders. In light of the Debtors' financial constraints, and as part of the Debtors' strategy to preserve and enhance their near-term liquidity given the absence of an imminent rebound in operating performance due to the macroeconomic downturn, Nortek elected to forgo making the 8 ½% Notes interest payment due on September 1, 2009. The Debtors believed it to be imprudent to drain liquidity with the funding of interest payments on notes that would likely be impaired in the financial restructuring.

28.     While the Debtors currently have the availability to incur additional indebtedness under the ABL Facility, the current agreement contains a springing "consolidated fixed charge ratio" covenant such that if Excess Availability (as defined in the ABL Facility Agreement) is less than $40 million, Nortek must maintain a fixed charge ratio of not less than 1.1x. Based on the Debtors' estimates, if they utilized their availability under the ABL Facility to fund their near-term debt obligations, they would fail the consolidated fixed charge ratio covenant and trigger a default under the ABL Facility.

C.     **Development of the Prepackaged Plan**

29.     Prior to the Commencement Date, Nortek engaged in negotiations over the terms of a financial restructuring with its core creditor groups. Pursuant to these negotiations, on

September 3, 2009, the Debtors and certain holders representing more than two-thirds of the principal amount of the 8 ½% Notes, a substantial portion of the principal amount of the 10% Notes, and a majority of the principal amount of the NTK 10 ¾% Notes entered into a Restructuring and Lock-Up Agreement (as amended, the "*Restructuring Agreement*"). Such holders of the 8 ½% Notes, 10% Notes, and NTK 10 ¾% Notes that are party to the Restructuring Agreement are referred to herein as the "*Consenting Debtholders*." All of the Consenting Debtholders are members of an ad hoc committee comprised of certain holders of the 8 ½% Notes, 10% Notes, and NTK 10 ¾% Notes (the "*Ad Hoc Committee*"). The parties agreed to implement the financial restructuring through the solicitation of votes for the Prepackaged Plan and the filing of chapter 11 cases before October 27, 2009, and the filing of the Prepackaged Plan within two business days thereafter, pursuant to the terms set forth in the Restructuring Agreement. Certain actions or transactions contemplated under the Prepackaged Plan require the reasonable consent of the majority in principal amount of the holders of 8 ½% Notes that are members of the Ad Hoc Committee ("*Noteholder Consent*").

## V.

## Summary of the Prepackaged Plan

30.     On September 18, 2009, in accordance with the Restructuring Agreement, the Debtors commenced a solicitation of votes from certain of their creditors to accept or reject the Prepackaged Plan through the distribution of the Disclosure Statement. As set forth in the Affidavit of Service and Vote Certification of Financial Balloting Group LLC (the "*FBG Affidavit*"), the Prepackaged Plan has been accepted in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code by all of the impaired classes of claims against Nortek, Inc.

31.     Among the classes of claims against NTK Holdings, the class consisting of holders of NTK 10 ¾% Notes voted to accept the Prepackaged Plan, while the class consisting of lenders under the NTK Holdings Senior Unsecured Loan voted to reject the Prepackaged Plan. The Debtors believe they have satisfied the requirements of section 1129(b) of the Bankruptcy Code and intend to seek confirmation of the Prepackaged Plan notwithstanding the rejection of the Prepackaged Plan by the NTK Holdings Senior Unsecured Loan lenders.

32.     Under the terms of the Prepackaged Plan, holders of the 8 ½% Notes and the 9 ⅞% Notes will receive 93% of the equity in the Reorganized Debtors (as defined in the Prepackaged Plan). Holders of the 10% Notes will receive 5% of the equity in the Reorganized Debtors, and will also receive new notes bearing interest at 11% per annum in a face amount of $750 million plus accrued but unpaid obligations (including interest) as of the effective date of the Prepackaged Plan.[2] Holders of the NTK 10 ¾% Notes and holders of claims arising under the NTK Holdings Senior Unsecured Loan will receive the remaining 2% of equity in the Reorganized Debtors, as well as certain warrants for the future purchase of additional equity.

33.     The Prepackaged Plan provides for the payment in full of (i) allowed administrative expense claims, (ii) federal, state, and local tax claims, and (iii) certain other priority non-tax claims. Trade creditors and certain other holders of general unsecured claims against Nortek, Inc. and the Subsidiary Debtors are unimpaired under the Prepackaged Plan and, absent the relief requested in the First Day Motions, will receive payment in full on account of their claims on the latest of (i) the effective date of the Prepackaged Plan (or as soon thereafter as

_____

[2] The Prepackaged Plan entitles holders of the 10% Notes to this distribution because such holders voted to accept the Prepackaged Plan in amounts exceeding the statutory thresholds of section 1126 of the Bankruptcy Code. Had the class voted to reject the Prepackaged Plan, the Prepackaged Plan provided that claims arising under the 10% Notes would be reinstated or would receive such distributions as required by section 1129(b) of the Bankruptcy Code.

reasonably practicable), (ii) the date on which such claim would be paid in the ordinary course of the Debtors' business, or (iii) as otherwise agreed by the Debtors and the holder of such claim. Holders of equity interests in NTK Holdings, the Debtors' ultimate corporate parent, will not receive a distribution.

34.     The Prepackaged Plan contemplates a comprehensive financial restructuring of the Debtors' existing capital structure that will allow the Debtors to delever their balance sheet through short and consensual chapter 11 cases, and emerge from chapter 11 poised for future growth and stability.

## VI.

## Summary of First Day Motions

35.     Concurrently with the filing of their chapter 11 petitions, the Debtors have filed, for the Court's approval, a number of First Day Motions, which the Debtors believe are necessary to enable them to operate in chapter 11 with a minimum of disruption and loss of productivity. The Debtors respectfully request that each of the First Day Motions be granted, as they are a critical element in stabilizing and facilitating the Debtors' operations during the pendency of these chapter 11 cases. A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.

## A.     Motion for an Order Directing Joint Administration of Chapter 11 Cases

36.     By this motion (the "*Joint Administration Motion*"), the Debtors request, pursuant to Bankruptcy Rule 1015(b), the joint administration of the Debtors' chapter 11 cases. As discussed above, NTK Holdings is the parent of Nortek Holdings, which itself is the parent of Nortek, Inc. The Subsidiary Debtors are all either direct or indirect subsidiaries of Nortek, Inc. I am informed by counsel that, as a result, the Debtors are "affiliates" as defined under section

101(2) of the Bankruptcy Code and, accordingly, this Court is authorized to consolidate these cases for procedural purposes.

37.     Because joint administration of these cases will remove the need to prepare, replicate, file and serve duplicative notices, applications and orders, joint administration will save substantial time and expense for the Debtors and their estates. Further, joint administration will relieve this Court of entering duplicative orders and maintaining duplicative files and dockets and, similarly, simplify supervision of the administrative aspects of these chapter 11 cases by the United States Trustee for the District of Delaware.

38.     Consequently, I believe joint administration of the Debtors' chapter 11 cases is in the best interests of the Debtors, their estates, and all parties in interest, and the relief requested in the Joint Administration Motion should be granted.

**B.      Debtors' Motion for an Interim and Final Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Approving the Debtors' Proposed Adequate Assurance; and (III) Approving Procedures for Resolving Requests for Additional Adequate Assurance**

39.     By this motion (the "*Utilities Motion*"), the Debtors request entry of (a) an interim order (i) prohibiting utility companies from altering, refusing, or discontinuing services to, or discriminating against, the Debtors on account of prepetition amounts outstanding, or on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of the Final Order, (ii) approving the Debtors' Proposed Adequate Assurance (as defined in the Utilities Motion), (iii) approving the Debtors' proposed procedures for resolving any Additional Assurance Requests (as defined in the Utilities Motion), and (iv) scheduling a hearing on the Motion to consider granting the relief requested herein on a final basis; and (b) a final order granting the relief requested in the Utilities Motion on a final basis

40.     In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, water, telephone services, and/or other similar services (collectively, the "*Utility Services*") from a number of utility companies or their brokers (collectively, the "*Utility Companies*"). Annexed to the Utilities Motion as Exhibit "C" is a non-exclusive list of Utility Companies that provide Utility Services to the Debtors (the "*Utility Services List*"). The relief requested in the Utilities Motion applies to all Utility Companies providing Utility Services to the Debtors and is not limited to those listed on the Utility Service List.

41.     Uninterrupted Utility Services are essential to the Debtors' ongoing operations and the success of the Debtors' chapter 11 cases. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' reorganization efforts. It is essential that the Utility Services continue uninterrupted during the chapter 11 cases.

42.     Based on the foregoing, the relief requested in the Utilities Motion is not prejudicial to any party in interest and, in fact, only benefits the Debtors' estates and their creditors. Accordingly, I believe the relief requested in the Utilities Motion should be granted.

C.     **Debtors' Motion for Authority to Pay Prepetition Sales and Use Taxes, Property Taxes, and Certain Other Governmental Assessments**

43.     By this motion (the "*Tax Motion*"), the Debtors request authorization to pay all prepetition sales and use taxes, property taxes, and other certain governmental assessments of franchise fees and business license fees to various state and local authorities (collectively, the "*Taxing Authorities*"), including those obligations subsequently determined upon audit to be owed for periods prior to the Commencement Date. A list of the Taxing

Authorities is annexed as <u>Exhibit "B"</u> to the Tax Motion.[3] Although the Debtors believe the list

of Taxing Authorities set forth therein is substantially complete, the relief requested in the Tax

Motion is to be applicable with respect to all Taxing Authorities and is not limited to those

Taxing Authorities set forth therein.

44.     Payment of the prepetition Sales and Use Taxes, Property Taxes, and

Other Governmental Assessments (each as defined in the Tax Motion) is critical to the Debtors'

continued, uninterrupted operations. Nonpayment of these obligations may cause Taxing

Authorities to take precipitous action, including, but not limited to, filing liens, preventing the

Debtors from conducting business in the applicable jurisdictions, or seeking to lift the automatic

stay, any of which would disrupt the Debtors' day-to-day operations and could potentially

impose significant costs on the Debtors' estates.

45.     The requested relief is also justified because to the extent the Debtors have

collected Sales Taxes from their customers, such funds must be held in trust by the Debtors for

the benefit of the Taxing Authorities and do not constitute property of the Debtors' estates.

46.     Moreover, many federal and state statutes hold officers and directors of

collecting entities personally liable or criminally responsible for certain taxes owed by those

entities. To the extent that any Sales and Use Taxes remain unpaid by the Debtors, the Debtors'

officers and directors may be subject to lawsuits or criminal prosecution during the pendency of

these chapter 11 cases. The threat of a lawsuit or criminal prosecution, and any ensuing liability,

would distract the Debtors and their personnel from important tasks, to the detriment of all

parties in interest. The dedicated and active participation of the Debtors' directors, officers, and

---

[3] The Debtors remit taxes to taxing authorities in respect of federal, state, and local income taxes, social security, and Medicare that the Debtors withhold from employees' wages. Remittance of these taxes to the applicable taxing authorities is addressed in the *Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing Payment of Wages, Compensation, and Employee Benefits.*

other employees is not only integral to the Debtors' continued, uninterrupted operations, but also essential to the orderly administration of these chapter 11 cases.

47.     Consequently, I believe the relief requested in the Tax Motion is in the best interests of the Debtors, their estates, and all parties in interest, and should be granted.

**D.     Debtors' Motion for (I) Authority to (A) Continue Existing Cash Management System and (B) Maintain Existing Bank Accounts and Business Forms and (II) an Extension of Time to Comply with Section 345(b) of the Bankruptcy Code**

48.     To manage their businesses efficiently and seamlessly, the Debtors use a cash management system (the "*Cash Management System*") to collect and transfer the funds generated by their operations and to disburse funds to satisfy their financial obligations.  The Cash Management System facilitates the Debtors' cash monitoring, forecasting, and reporting, and enables the Debtors to maintain control over the administration of their bank accounts (the "*Bank Accounts*") located at various banks (the "*Banks*"), including those listed on Exhibit "1" of the proposed order annexed to the motion (the "*Cash Management Motion*").  By the Cash Management Motion, the Debtors seek entry of an order, pursuant to sections 105(a), 363(c) and 345(b) of the Bankruptcy Code, granting them (i) authorization to (a) continue their existing Cash Management System and (b) maintain existing Bank Accounts and business forms, and (ii) an extension of time to comply with section 345(b) of the Bankruptcy Code.  Without the requested relief, it is my belief that the Debtors would be unable to maintain their financial operations effectively and efficiently, which would cause significant harm to the Debtors and to their estates.

49.     In the ordinary course of business, the Debtors use the Cash Management System, which is similar to those used by other large companies that operate in numerous locations, to collect, transfer, and disburse funds generated by the Debtors' business operations efficiently.  The Debtors record such collections, transfers, and disbursements as they are made.

The Cash Management System is organized around the Debtors' corporate functions and its residential ventilation products, commercial and residential HVAC and home technology products segments. For demonstrative purposes, a series of diagrams generally illustrating the Cash Management System is annexed as Exhibit "B" to the Cash Management Motion.

50.     The Cash Management System has three (3) main components: (i) cash collection, including the collection of payments made to the Debtors by customers, (ii) cash concentration; and (iii) cash disbursements to fund the Debtors' operations, primarily consisting of payroll and payments to the vendors and service providers that supply the goods and services which the Debtors use to manufacture their products and serve their customers. In addition, the Cash Management System is comprised of certain stand-alone accounts that are used for the purposes specified in the Cash Management Motion. The Cash Management System is managed by the Treasury Department at Nortek, Inc. and by the finance groups at each operational subsidiary. Nortek, Inc. has deposit account control agreements with Bank of America, N.A., the agent under its ABL Facility, and certain of the other Banks where the Bank Accounts are located, which gives the agent, upon the occurrence of certain events enumerated in the agreement, certain rights to take control for enforcement purposes over the Debtors' cash and deposit accounts and funds maintained therein that are subject to the control agreement.

51.     The Cash Management System constitutes an ordinary course and essential business practice that provides significant benefits to the Debtors, including, among other things, the ability to (i) control corporate funds; (ii) ensure the maximum availability of funds when and where necessary; and (iii) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance

information. Based upon the foregoing, maintenance of the existing Cash Management System is in the best interest of the Debtors and their estates.

52.     I am informed by counsel that the Office of the United States Trustee's *Operating Guidelines For Chapter 11 Cases* (the "***U.S. Trustee Guidelines***") mandate the closure of the Debtors' prepetition bank accounts, the opening of new accounts, including special accounts for the payment of taxes and segregation of cash collateral, and the immediate printing of new checks with "Debtor in Possession" and other information printed on them. If the Debtors were required to comply with these guidelines, it is my belief that their operations would be severely harmed by the disruption, confusion, delay, and cost that would most certainly result from the closure of their existing Bank Accounts, the opening of new accounts and the immediate printing of new checks.

53.     The Debtors believe, therefore, that their transition to chapter 11 will be smoother and more orderly, with minimum disruption and harm to their operations, if the Bank Accounts are continued following the Commencement Date with the same account numbers; provided, however, that checks issued or dated prior to the Commencement Date will not be honored, absent a prior order of this Court. By preserving business continuity and avoiding the disruption and delay to the Debtors' collection and disbursement procedures that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, and customers, will be best served. Accordingly, the Debtors respectfully request authority to maintain the Bank Accounts in the ordinary course of business, to continue utilizing the Cash Management System to manage cash in a manner consistent with prepetition practices, and to pay any ordinary course Bank fees that may be incurred in connection with the Bank Accounts prior to or following the Commencement Date.

54.     Furthermore, the Debtors request that the Banks be authorized to accept and honor all representations from the Debtors as to which checks should be honored or dishonored consistent with any order(s) of this Court, whether or not the checks are dated prior to, on, or subsequent to the Commencement Date. The Debtors further request that the Banks shall not be liable to any party on account of following the Debtors' instructions or representations regarding which checks should be honored. The Banks also shall be permitted to accept and process chargebacks against the Bank Accounts arising out of returned deposits into such accounts without regard to the date such return item was deposited.

55.     In addition to mandating the closure of all bank accounts, I am informed by counsel that the U.S. Trustee Guidelines require the immediate printing of new checks with the label "Debtor in Possession," and other information related to the Debtors' cases. Similarly, Local Rule 2015-2(a) of the of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "*Local Rules*") mandate that the Debtors, upon exhausting their existing check stock, order new checks with the "Debtor in Possession" label. The Debtors issue a large number of checks, and use a large volume of purchase orders, letterhead, envelopes, promotional materials, and other business forms (collectively, the "*Business Forms*"), in the ordinary course of business. In light of the expedited nature of these prepackaged cases and to minimize expenses, the Debtors request that they be authorized to continue using their existing business forms, including electronically generated forms, substantially in the form existing immediately before the Commencement Date, without reference to their status as debtors in possession, and without adding the other related information required by the Guidelines.

56. The Debtors further request (i) a ninety (90) day extension of the time to comply with Local Rule 2015-2(a)'s requirement that any newly ordered check stock bear the debtor in possession legend and the bankruptcy case number and (ii) a waiver of this requirement upon confirmation of the Prepackaged Plan. The Debtors intend to remain in chapter 11 only as long as it takes to confirm and effectuate their prepackaged reorganization plan. Obtaining new Business Forms (including new check stock) and implementing new electronic check forms across all of their businesses would create significant expense and logistical difficulties. Once such a transition is accomplished, the Debtors would almost immediately have to start the process all over again to return to using their regular Business Forms upon their emergence. Furthermore, the Debtors have publicized their case filing through press releases and a prepetition solicitation, and will send a notice of commencement to all known creditors. Given such wide publication of the Debtors' status as debtors in possession, publication on checks and other business forms will add little additional notice. Accordingly, the Debtors request a waiver of the requirement to mark new check stock with the debtor in possession status unless the Debtors remain in bankruptcy for longer than expected.

57. By the Cash Management Motion, the Debtors also seek a sixty (60) day extension of the time to comply with section 345(b) of the Bankruptcy Code. During the extension period, the Debtors propose to engage the Office of the United States Trustee in discussions to determine what modification to their investment guidelines, if any, would be appropriate under the circumstances. The Debtors believe that the benefits of the requested extensions far outweigh any harm to the estates.

58. With the exception of the investment accounts described in the Cash Management Motion, the Debtors' transactional bank accounts are insured by the United States

government through the Federal Deposit Insurance Corporation's ("*FDIC*") Transaction Account Guarantee ("*TAG*") program. Under this program, non-interest bearing transactional accounts are fully insured by the FDIC. The TAG program was initially set to expire on December 31, 2009, but the FDIC has extended it through June 30, 2010. Institutions have until November 2, 2009 to choose to opt out of participating in the program during the extension period, but institutions that choose to opt out will continue participating through the end of the year. Therefore, the Debtors submit that because of the TAG program, their transactional Bank Accounts comply with section 345(b) regardless of the amounts deposited into these accounts. The Debtors expect to emerge from chapter 11 before any of their banks could cease participating in the program at the end of the year.

59. In addition, the Debtors believe that funds held in their Bank Accounts, even those in investment accounts and in excess of the usual limits insured by the FDIC, are secure and that obtaining bonds to secure those funds, as required by section 345(b) of the Bankruptcy Code, is unnecessary and detrimental to the Debtors' estates and creditors. The Debtors submit that "cause" exists pursuant to section 345(b) of the Bankruptcy Code to extend the time to comply with this section's requirements because, among other considerations, (i) the Debtors' Banks are federally or state chartered banks subject to supervision by federal banking regulators, (ii) the Debtors retain the right to remove funds held at the Banks and establish new bank accounts as needed, (iii) the cost associated with satisfying the requirements of section 345 is burdensome, and (iv) the process of satisfying those requirements would lead to needless inefficiencies in the management of the Debtors' businesses. Moreover, strict compliance with the requirements of section 345 of the Bankruptcy Code would not be practical in these chapter

11 cases. A bond secured by the undertaking of a corporate surety would be prohibitively expensive, if such bond is available at all.

60.    Based on the foregoing, the relief requested in the Cash Management Motion is not prejudicial to any party in interest and, in fact, only benefits the Debtors' estates and their creditors. Accordingly, I believe the relief requested in the Cash Management Motion should be granted.

E.    **Debtors' Motion (I) Authorizing The Debtors to Pay Wages, Salaries, Compensation, And Employee Benefits, And (II) Authorizing and Directing the Debtors' Financial Institutions to Honor and Process Checks and Electronic Funds Transfers Related to Such Obligations**

61.    By this motion (the "*Employee Motion*"), the Debtors request, pursuant to sections 105(a), 363(b), and 507(a) of the Bankruptcy Code, entry of an order (I) authorizing, but not requiring, the Debtors to (a) pay, in their sole discretion, wage, salary and commission obligations, payroll taxes, garnishments, expense reimbursements, employee benefits, bonuses, certain severance obligations, and retirement plan and benefit obligations, and costs incident to the foregoing (each as defined in the Employee Motion, and collectively, the "*Employee Obligations*"), and (b) maintain and continue to honor their practices, programs, and policies for their employees (the "*Employee Benefits*") as they were in effect on the Commencement Date, and as they may be modified, amended, or supplemented from time to time in the ordinary course of business, and (II) authorizing the Debtors' banks and financial institutions to receive, honor, process, and pay any and all checks or electronic funds transfers drawn on the Debtors' accounts in satisfaction of Employee Obligations and Employee Benefits

## The Debtors' Prepetition Employee Obligations

62.    In the ordinary course of their businesses, the Debtors incur payroll and various other obligations and provide other benefits to their employees for the performance of

services.[4]  As of the Commencement Date, the Debtors employ approximately 4,542 full-time[5] employees, of which (i) approximately 1,420 are salaried employees (the "*Salaried Employees*"),[6] (ii) approximately 3,011 are non-union employees paid on an hourly basis (the "*Hourly Employees*," and together with the Salaried Employees, the "*Full-time Employees*"), and (iii) approximately 111 employees are employed pursuant to an independent collective bargaining agreement (the "*CBA*") between the Debtors and the Sheet Workers' International Association, Local Union Number 16 (the "*Union*," and its represented employees, the "*Union Employees*") and paid on an hourly basis.  The Debtors also employ approximately 306 part-time employees who are paid on an hourly basis (the "*Part-time Employees*," and, together with the Full-time Employees and the Union Employees, the "*Employees*").

63.  The Debtors have incurred obligations to their Employees in the period prior to the Commencement Date.  Certain of these costs and obligations are outstanding, due and payable, while others will become due and payable in the ordinary course of the Debtors' businesses after the Commencement Date.  Pursuant to the Employee Motion, the Debtors request authority to pay such obligations for the reasons discussed below.

**Wages, Salaries, Commissions, and Incentive Programs**

(i)  **Wage and Salary Obligations**

64.  Prior to the Commencement Date and in the ordinary course of their businesses, the Debtors paid obligations relating to wages, salary, and compensation

---

[4] Not all the Debtors have employees.

[5] Full-time Employees are those that work at least thirty seven and a half (37.5) hours per week at Nortek, Inc. and those that work at least forty (40) hours per week at all other Debtor entities that have employees.

[6] Salaried Employees fall into two categories: (a) employees who are paid a salary and are not subject to overtime pay (the "*Salaried Exempt Employees*") and (b) employees who are paid hourly, but on a salary basis, and are subject to overtime pay (the "*Salaried Non-Exempt Employees*").

(collectively, the "*Wage Obligations*") to their Employees on a weekly, bi-weekly, semi-monthly, or monthly basis. Due to the decentralized nature of the Debtors' operations, the schedule by which the Debtors pay Wage Obligation varies by Debtor entity. All Wage Obligations, however, are paid through direct deposit or by check. Based on the previous twelve-month period, the Debtors' average monthly gross payroll is approximately $17,400,000.

65.     Under the Debtors' varied payroll systems, a substantial portion of Employees are compensated for work already performed in arrears. Consequently, when most Employees receive their direct deposit or payroll checks, they have already earned – and are owed – additional pay. As of the Commencement Date, the Debtors estimate they owe approximately $6,300,000 outstanding in accrued prepetition Wage Obligations.

(ii)     **Payroll Taxes**

66.     The Debtors are required by law to withhold from the Employees' salaries and wages amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "*Withholding Taxes*") and to remit the same to the appropriate taxing authorities (collectively, the "*Taxing Authorities*"). In addition, the Debtors are required to make payments from their own funds on account of Social Security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "*Employer Payroll Taxes*" and, together with the Withholding Taxes, the "*Payroll Taxes*").

67.     The Debtors' average monthly liability for Payroll Taxes as of the Commencement Date is approximately $4,900,000, of which approximately $3,500,000 is withheld from Employees' paychecks and approximately $1,400,000 is paid by the Debtors.

Therefore, as of the Commencement Date, the Debtors estimate they owe the Taxing Authorities approximately $1,800,000 on account of Payroll Taxes relating to the prepetition period, of which approximately $1,300,000 is withheld from Employee's paychecks and approximately $500,000 is paid by the Debtors.

     (iii)    **Deductions**

     68.    In the ordinary course of their businesses, the Debtors deduct, at the request of their Employees, certain amounts from the Employee's gross pay for various expenses, such as health and dependent care savings accounts, dental, vision, life and health insurance, 401(k) contributions, savings bonds and charitable contributions to the United Way (the "*Deductions*"). These amounts are held in trust by the Debtors and then remitted to applicable third parties. On average, the Debtors withhold approximately $1,400,000 per month in Deductions. As of the Commencement Date, the Debtors estimate that they have approximately $500,000 of unremitted Deductions relating to the prepetition period.

     (iv)    **Garnishments**

     69.    In the ordinary course of processing payroll checks for their Employees, the Debtors may be required by law, in certain circumstances, to withhold from certain Employees' wages amounts for various garnishments, such as tax levies, child support, and other court-ordered garnishments (collectively, the "*Garnishments*"). The Debtors then remit the Garnishments to the appropriate state agencies. On average, the Debtors withhold approximately $140,000 per month in Garnishments. As of the Commencement Date, the Debtors estimate that they have approximately $54,000 of unremitted Garnishments relating to the prepetition period.

(v)  **Obligations in Respect of Payroll Processing Service**

70.   The Debtors retain certain payroll service providers to facilitate payment of their Employee Obligations. The Debtors are invoiced by each payroll service provider in accordance with the chart provided in the Employee Motion. As of the Commencement Date, the Debtors estimate they owe their payroll service providers approximately $130,000 in outstanding prepetition amounts on account of services rendered.

(vi)  **Reimbursement of Expenses**

71.   Certain of the Debtors' Employees incur various expenses in the discharge of their ordinary duties, such as travel and meal expenses. Because these expenses are incurred as part of their official duties and in furtherance of the Debtors' businesses, the Debtors reimburse the Employees for such expenses (the "*Expense Reimbursement*").

72.   Employees must submit an expense report detailing their claims and seek reimbursement from the Debtors. There may be a lag of approximately one week between submission and reimbursement of such claims. Because of the lag between submission and reimbursement of an expense report, and because Employees do not always submit their expense reports with regularity, it is difficult for the Debtors to determine the amount of Expense Reimbursements outstanding at any particular time. Based upon historical figures, however, the Debtors estimate that there may be approximately $300,000 of Expense Reimbursements outstanding as of the Commencement Date. Accordingly, the Debtors request authority to pay postpetition up to the estimated $300,000 of Expense Reimbursements incurred prepetition.

(vii)  **Commission and Incentive Obligations**

73.   The Debtors' businesses rely heavily on the ability to attract new customers and maintain relationships with existing customers. Those Employees who promote

and sell the Debtors' products, including, among others, sales representatives, account managers, and executives (collectively, the "*Sales Staff*"), serve as the Debtors' public face and are responsible for enhancing service to existing customers and cultivating new business opportunities.[7] In certain instances, compensation for a member of the Sales Staff is tied to the sales that member generates. In addition to base pay, and subject to criteria that vary by function and the Debtors' business segment, the Debtors provide additional compensation to their Sales Staff. Specifically, members of the Sales Staff may be eligible to receive additional monthly, quarterly or annual achievement commissions if specific sales benchmarks are met or surpassed (the "*Commission Obligations*"). Additionally, to recognize and encourage exceptional employee performance, certain of the Debtors maintain incentive programs that reward those Employees who meet or surpass defined career-development goals (the "*Incentive Obligations*," and together with the Commission Obligations, the "*Commission and Incentive Obligations*"). The Debtors generally pay the Commission and Incentive Obligations in arrears on a bi-weekly, monthly, quarterly or annual basis.

74. Importantly, the Debtors' competitors offer similar incentives to their respective sales staff and employees; therefore, if the Debtors were to cut or not pay amounts due under such programs, the Debtors would be at a competitive disadvantage for retaining talented salespersons and employees at a time when such talent is critical to the Debtors' businesses. Given that the Debtors' success depends upon the continued efforts and excellent service of their Sales Staff and Employees, it is imperative that the Debtors continue paying their Commission and Incentive Obligations.

---

[7] The Debtors have requested authority to pay obligations to third party non-employee sales brokers under the *Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for Authorization to Pay the Prepetition Claims of Certain Creditors in the Ordinary Course of Business* contemporaneously filed herewith.

75. On average, the Debtors accrue approximately $3,000,000 in Commission and Incentive Obligations every month. The Debtors estimate that approximately $2,900,000 in prepetition Commission and Incentive Obligations are accrued and unpaid as of the Commencement Date.

### Employee Benefits Programs

76. In the ordinary course of business, the Debtors maintain a number of the employee benefits programs, including: (a) insurance coverage, such as health, dental, prescription drug, vision, short- and long-term disability, and life insurance; (b) ordinary course severance programs for certain, qualifying Employees (the "*Severance Programs*"); (c) retirement plans, including 401(k) and defined benefit pension plans; (d) healthcare and dependent-care flexible spending accounts; (e) statutorily-mandated benefits, such as military, jury and family or medical-related leave; and (f) other programs, such as employee assistance programs (under which confidential counseling is offered to Employees and their dependents with respect to family issues, mental problems, stress, substance abuse, and eating disorders), commuter benefits, tuition reimbursement, and gym memberships (collectively, the "*Employee Benefits*"). Because of the decentralized system under which the Debtors operate, the types of Employee Benefits and the terms of the Employee Benefits offered vary by Debtor.

77. As of the Commencement Date, certain contributions or benefits on account of the Employee Benefits have accrued prepetition but are not yet payable. These amounts, however, will become payable in the ordinary course of the Debtors' businesses. Accordingly, the Debtors seek authority to pay these amounts as they come due. The Benefits Obligations that the Debtors seek authority to pay include those accrued under the following categories:

(a) **Self-Insured Plans**: The Debtors maintain self-insured plans that provide general health and dental insurance, prescription drug, and vision plans (collectively, the "*Self-Insured Plans*"). Under the Self-Insured Plans, the Debtors assume liability for and initially pay for certain benefits, rather than paying premiums for independent insurance coverage. Various third parties serve as claims agents for, and process and pay, the medical, dental, prescription drug and vision claims that accrued under the Self-Insured Plans prior to the Commencement Date. Based on the historical level of claims, the Debtors estimate that, as of the Commencement Date, approximately $4,500,000 in prepetition claims under the Self-Insured Plans will be submitted by Employees postpetition.

(b) **Third-Party Insured Plans**: The Debtors also maintain certain insured benefit plans under which the Debtors, the Employees or both contribute to the payment of premiums for insurance or other coverage provided by third parties (collectively, the "*Insured Plans*"). The Insured Plans include general health, dental, prescription drug, vision and short- and long-term disability, and life insurance. Generally, the Debtors pay all health and dental insurance obligations with respect to the Insured Plans in advance at the beginning of each month and all life and disability insurance obligations with respect to the Insured Plans in arrears at the end of each month. Accordingly, the Debtors estimate that there will be $1,000,000 of accrued but unpaid premium contributions on account of the Insured Plans as of the Commencement Date.

(c) **Company-Sponsored Employee Benefits**: The Debtors also maintain certain other Employee Benefits under which the Debtors, the Employees or both contribute to the benefits provided thereunder (collectively, the "*Sponsored Programs*"). The Sponsored Programs include, among others, (i) flexible spending accounts, the funds of which are used to pay health care and dependent care costs on a pre-tax basis; (ii) tuition reimbursement programs; (iii) employee assistance programs; (iv) gym reimbursement programs; (v) car allowance programs; (vi) commuter benefits; (vii) severance programs; (viii) retirement plans; and (ix) business travel accident insurance; and (x) health reimbursement arrangements for high-deductible health plans. Based on the historical levels of participation in the Sponsored Programs, the Debtors estimate that there are approximately $11,400,000 in accrued but unpaid obligations as of the Commencement Date.

78.     The Debtors believe that many of the Employee Obligations relating to the period prior to the Commencement Date constitute priority claims under sections 507(a)(4) and (5) of the Bankruptcy Code in that they do not exceed $10,950 per Employee. Accordingly, the

relief requested will affect only the timing of the payment of these priority obligations, and should not prejudice the rights of general unsecured creditors or other parties in interest. The Debtors submit that, to the extent any Employee is owed in excess of $10,950, satisfaction and payment of such amount is necessary and appropriate.

79. Further, payments made in connection with the Employee Obligations and Employee Benefits are justified by the facts and circumstances of the case. In this case, any delay or failure to pay wages, salaries, expense reimbursements, benefits, severance, and other similar items could irreparably impair the Employees' morale, dedication, confidence, and cooperation, and could adversely impact the Debtors' relationship with the Employees at a time when the Employees' support is critical to the success of the Debtors' chapter 11 cases. The Debtors simply cannot risk the substantial damage to their businesses that would inevitably attend any decline in their Employees' morale. Moreover, because these prepackaged cases are advancing under a compressed schedule and because general unsecured claims are unimpaired under the Prepackaged Plan, paying the Employees in the ordinary course of business will enable the Debtors to operate smoothly during these cases. Such relief allows the Debtors to focus on consummating the Prepackaged Plan for the benefit of the Debtors, their estates, and their creditors. Under these circumstances, approval of the requested relief is appropriate.

80. Absent an order granting the relief requested in the Employee Motion, the Employees could suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question may be needed to enable certain of the Employees to meet their own personal financial obligations. Without the requested relief, the stability of the Debtors will be undermined, perhaps irreparably, by the distinct possibility that otherwise loyal Employees will seek other employment alternatives. In addition, it would be inequitable to require the

Employees to bear personally the cost of any business expenses they incurred prepetition on behalf of the Debtors with the understanding that they would be reimbursed.

81.     Moreover, the continuation of the Severance Programs offers financial protection and support for employees who have been displaced due to business circumstances. Cessation of severance payments to the former employees may result in lower morale and loyalty among the remaining Employees – many of whom have developed strong and lasting relationships with those who have been terminated – and cause those remaining Employees to perform their duties at less-than optimal levels, or lead them to seek other employment. This will severely hinder the Debtors' ability to reorganize.

82.     With respect to Payroll Taxes in particular, the payment of such taxes will not prejudice other creditors of the Debtors, as I have been informed that the relevant Taxing Authorities generally would hold priority claims under the Bankruptcy Code with respect to such obligations. Moreover, the portion of the Payroll Taxes withheld from an employee's wages on behalf of an applicable Taxing Authority are held in trust by the Debtors. As such, I have been informed that these Payroll Taxes are not property of the Debtors' estates under section 541 of the Bankruptcy Code.

83.     In addition, the Debtors believe it is necessary to continue payment of administrative fees to the administrators of the Debtors' Employee Obligations and to the administrators of programs related to Employee Benefits. Without the continued service of these administrators, the Debtors will be unable to continue to honor their obligations under these programs in an efficient and cost-effective manner.

84.     The Debtors do not seek to alter any of the Employee Benefits at this time. The Employee Motion is intended only to permit the Debtors, in their discretion, to (i) make

payments consistent with existing policies to the extent that, without the benefit of an order approving this Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and (ii) continue to honor practices, programs, and policies with respect to their Employees, as such practices, programs, and policies were in effect as of the Commencement Date. Payment of all Employee Obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors' estates, their creditors, and all parties in interest, and will enable the Debtors to continue to operate their businesses in an economic and efficient manner without disruption. The Debtors' Employees are central to their businesses and are vital to these chapter 11 cases, and failure to pay the Employee Obligations would have a detrimental impact on the Debtors, their value, and their reorganization efforts. The total amount sought to be paid herein is relatively modest compared with the size of the Debtors' overall businesses and the importance of the Employees to the Debtors' chapter 11 cases.

85.     The Debtors submit that as set forth above, payments made in connection with the Employee Obligations and Employee Benefits are justified by the facts and circumstances of the case.

86.     Based on the foregoing, the relief requested in the Employee Motion is not prejudicial to any party in interest and, in fact, only benefits the Debtors' estates and their creditors. Accordingly, I believe the relief requested in the Employee Motion should be granted.

**F.    Debtors' Motion for Authority to (A) Continue
Their Workers' Compensation Programs and Their Liability, Property,
and Other Insurance Programs and (B) Pay All Obligations in Respect Thereof**

87.     By this motion (the "***Insurance Motion***"), the Debtors seek an order authorizing them to continue their workers' compensation and employer's liability policies and programs (the "***Workers' Compensation Programs***") and their various liability, property,

directors and officers' liability, and other insurance policies and programs, including any and all liability self-insurance programs (the "***General Insurance Programs***," and, together with the Workers' Compensation Programs, the "***Insurance Programs***") uninterrupted and to honor their undisputed prepetition obligations thereunder (the "***Insurance Obligations***").[8] As of the Commencement Date, the Debtors estimate that there are approximately $216,000 in unpaid and outstanding prepetition Insurance Obligations.

88.     To the extent any of the Debtors' employees hold valid claims under the Workers' Compensation Programs, the Debtors also seek authorization to modify section 362 of the Bankruptcy Code to permit these employees to proceed with their claims under the Workers' Compensation Programs. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Programs. Any claims relating to any of the General Insurance Programs or otherwise will remain subject to the automatic stay.

89.     In connection with the operation of their businesses, the Debtors maintain the Insurance Programs through several different insurance carriers (the "***Insurance Carriers***") including, but not limited to, the Insurance Programs and Insurance Carriers identified in Exhibit "B" to the Insurance Motion. The nature of the Debtors' businesses and the extent of their operations make it essential for the Debtors to maintain their Insurance Programs on an ongoing and uninterrupted basis. I believe that the nonpayment of any premiums, deductibles, or related fees under one of the Insurance Programs could result in one or more of the Insurance Carriers terminating their existing policies, declining to renew their insurance policies, or refusing to enter into new insurance agreements with the Debtors in the future. If the Insurance

---

[8]  In addition to the Insurance Programs discussed herein, the Debtors maintain numerous insurance programs with respect to, among other things, employee health, dental, disability, and life insurance benefits. These policies are addressed in a separate motion pertaining to the Debtors' employee wage policies and benefits programs and summarized above.

Programs are allowed to lapse without renewal, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others, which exposure could have an extremely detrimental impact on the Debtors' ability to successfully reorganize. Furthermore, the Debtors would then be required to obtain replacement policies on an expedited basis at what they expect to be a significantly higher cost to their estates. Accordingly, the Debtors must make all payments with respect to the Insurance Programs.

90.    Moreover, the Insurance Programs are vital to the Debtors' continued operations. Applicable state law mandates that the Debtors maintain workers' compensation coverage for their employees. Failure by the Debtors to pay the premiums associated with their Workers' Compensation Programs would jeopardize their coverage and expose the Debtors to substantial liability in fines by various state workers' compensation authorities.

91.    In addition, the risk that eligible workers' compensation claimants will not receive timely payments for prepetition employment-related injuries could have a devastating effect on the financial well-being and morale of the Debtors' current employees – perhaps resulting in employee departures. Employee departures at this critical time may result in a severe disruption of the Debtors' businesses with a substantially adverse impact on the Debtors, the value of their assets and businesses, and their ability to reorganize. The retention of the Debtors' qualified and dedicated senior management is also linked to the continuation of the directors' and officers' liability insurance policies. Finally, pursuant to the terms of many of their real property leases, as well as the guidelines established by U.S. Trustee, as I am informed by counsel, the Debtors are obligated to remain current with respect to certain of their primary Insurance Programs. Therefore, the continuation of the Insurance Programs, on an uninterrupted basis, and the payment of all prepetition and postpetition Insurance Obligations arising under the Insurance

Programs are essential to preserve the Debtors' businesses and preserve the value of the Debtors' estates for all creditors.

92.     Based on the foregoing, the relief requested in the Insurance Motion is not prejudicial to any party in interest and, in fact, only benefits the Debtors' estates and their creditors. Accordingly, I believe the relief requested in the Insurance Motion should be granted.

**G.      Debtors' Motion for Authorization to Pay Prepetition**
**Claims of Certain Creditors in the Ordinary Course of Business**

93.     By this motion (the "*Payable Claims Motion*"), the Debtors seek entry of an order that authorizes, but does not direct, the Debtors to pay the Debtors' allowed, fixed, liquidated, noncontingent, and undisputed prepetition claims (the "*Payable Claims*") of holders of General Unsecured Claims and Other Secured Claims[9] (each as defined in the Prepackaged Plan) (collectively the "*Prepetition Creditors*"), including claims of their prepetition suppliers of goods and services according to their ordinary business terms and in the ordinary course of business.

94.     These chapter 11 cases are the culmination of a lengthy and detailed process designed to restore the Debtors' financial condition while at the same time providing an appropriate treatment for the Debtors' creditors. The Debtors believe that a seamless transition into and through bankruptcy will preserve the value upon which the Prepackaged Plan is based. A fundamental aspect of the Debtors' efforts to minimize disruption during their cases is the Debtors' ability to maintain and develop their relationships with important vendors with whom the Debtors conduct business. The perception and understanding of these chapter 11 cases by such parties is vital to the success of the Debtors' reorganization.

---

[9] Certain of the Debtors' prepetition trade creditors, such as shippers and mechanics, may be secured creditors because of their capacity to assert liens on the Debtors' property.

95.     Indeed, the relief requested in the Payable Claims Motion is designed to create certainty in the Debtors' relationships with such parties. These relationships will contribute to the continued operation of the business of the Debtors during and after these chapter 11 cases. The Debtors are not seeking to pay these amounts immediately, but only such portions thereof as become due in the ordinary course of the Debtors' businesses and consistent with prepetition business practices.

96.     Further, the Debtors anticipate emerging from chapter 11 within a very short time period and concurrently herewith the Debtors have filed the Prepackaged Plan and Disclosure Statement. The Debtors are seeking approval of the Disclosure Statement and confirmation of the Prepackaged Plan as soon as possible. The Prepackaged Plan provides, inter alia, that the Payable Claims will be paid in full and thus be unimpaired. As a result, assuming confirmation of the Plan within 45-60 days, granting the relief requested in the Payable Claims Motion may accelerate in certain circumstances, and then only slightly, the timing of payments to the Debtors' vendors and other holders of unimpaired Nortek General Unsecured Claims or Nortek Other Secured Claims and will not affect or impair the rights of other creditors in these chapter 11 cases.

97.     Absent continuity of payment of the Payable Claims in the ordinary course of business, the Debtors' businesses will be disrupted. The adverse consequences of not being able to maintain existing terms with vendors could damage, perhaps irreparably, the Debtors' operations and potentially imperil their restructuring efforts if such Prepetition Creditors cease providing goods and services even for a short period of time.

98.     The Debtors estimate that, as of the Commencement Date, they owe a total of approximately $93,500,000 on account of undisputed Payable Claims.[10] Of those claims, the Debtors estimate that approximately $23,500,000 would also be entitled to administrative priority status pursuant to section 503(b)(9) of the Bankruptcy Code because they relate to goods delivered to the Debtors in the ordinary course of business within twenty (20) days of the Commencement Date. Furthermore, $645,000 of the Payable Claims may be secured. Approximately $390,000 of the Payable Claims arise from capital projects with vendors that may be able to assert mechanics liens on the Debtors' property and not less than $4,850,000 arise from shippers who may be able to assert possessory liens on the Debtor's property. Approximately $3,100,000[11] of the Payable Claims arise from Sales Broker commission obligations and $3,900,000 from the Royalty Programs. The Debtors estimate that approximately $56,700,000 of Payable Claims will become due and payable within the first twenty (20) days of these chapter 11 cases.

99.     In light of the prepackaged nature of these cases, the short duration of time which the Debtors expect to be in bankruptcy, and the fact that the Prepackaged Plan provides that General Unsecured Creditors and Other Secured Creditors will be unimpaired and that administrative and priority claims will be paid in full, I believe the relief requested in the Payable Claims Motion is in the best interests of the Debtors, their creditors, and all parties in interest and, therefore, the Payable Claims Motion should be granted.

---

[10] This figure does not include the value of goods in transit and not received by the Debtors as of the Commencement Date because amounts due for such goods will be paid in the ordinary course as administrative expense priority claims. This figure includes amounts paid by Debtors to non-Debtors, but does not include intercompany payments among Debtors, and intercompany payments among Debtors will not count against the cap.

[11] This figure does not include profits earned by certain sales representatives in transactions where the Commercial HVAC segment sells products at a discounted price directly to a sales representative who then re-sells the product to an end user at a retail mark-up.

**H.  Debtors' Motion for Authority
to Honor Prepetition Obligations to Customers and Otherwise
<u>Continue Customer Programs in the Ordinary Course Business</u>**

100.    Prior to the Commencement Date, in the ordinary course of business, and

as is customary in the building products manufacturing industry, the Debtors instituted and

engaged in certain activities to develop and sustain a positive reputation and relationship with

their customers.  To that end, the Debtors implemented various customer programs and policies

(collectively, the "***Customer Programs***") designed to ensure customer satisfaction, drive sales,

meet competitive pressures, develop and sustain customer relationships and loyalty, improve

profitability, and generate goodwill for the Debtors and their products and services.  By this

motion (the "***Customer Programs Motion***"), the Debtors request, pursuant to sections 105(a),

362(d), 363(b), and 503(b)(1) of the Bankruptcy Code, entry of the proposed order authorizing

the Debtors to continue the Customer Programs in the ordinary course of business and to perform

and honor, at the Debtors' sole discretion, their prepetition obligations thereunder.

101.    The Customer Programs are integral to the Debtors' efforts to stabilize and

restore vitality to their businesses and ultimately deliver the most value to all stakeholders in the

Debtors' chapter 11 cases.  The Debtors believe that they must promptly assure customers of

their continued ability to satisfy prepetition and postpetition obligations under the Customer

Programs to maintain their valuable customer base, and myriad other important benefits derived

there from, following the commencement of these chapter 11 cases.

102.    Due to the diverse range of customers for whom the Debtors provide

products and the diverse range of products the Debtors produce, many contracts between the

Debtors and their customers are unique and many include customer-specific incentives.  There

are, however, six (6) general types of Customer Programs that the Debtors use in their businesses

and which exist, or may come to exist, in many of the Debtors' customer contracts.  They include

the following: (i) warranty programs, (ii) volume-based rebate programs, (iii) cooperative advertising and other marketing related rebate programs, (iv) customer indemnity programs, (v) programs involving back charges, retainage, contract changes and deposits, and (vi) programs involving customer refunds, returns and allowances for credit, exchanges, billing, shipping and other normal course customer obligations. These Customer Programs permit the Debtors to cater flexibly to the needs of their diverse customer base. Set forth below is a description of the Customer Programs.

### The Warranty Customer Programs

103.    To protect their reputation for producing quality products and their relationships with their customers, the Debtors offer a number of warranties on their products, including, in some instances, extended warranties for which the Debtors receive compensation from the customer. Warranty claims are generally not covered by the Debtors' product liability insurance. The specific terms and conditions of these warranties are usually included on an insert shipped with the product or in a contract with the customer, but the Debtors also seek authority to honor customer claims consistent with past practices even if the claim falls outside of a specific warranty agreement. The terms of each warranty vary depending on the product sold and the location where the product is sold, and some warranties last for as long as the purchaser owns the product or related property. Similarly, the qualities or performance that the Debtors guarantee through their warranties vary from product to product. Sometimes, as part of honoring a warranty or other policy, or because it is advisable in the Debtors' business judgment, the Debtors perform on-site inspection or servicing of products purchased by their customers, and sometimes pay the shipping charges for customers to return products. In addition, the Debtors occasionally honor customers' warranty claims in circumstances where the Debtors do not believe that a technical breach of the warranty exists if the Debtors believe that avoiding a

dispute and maintaining the good will of their customer justifies such a compromise. The Debtors provide warranties for products produced in each of their business segments.

104. At the time of a sale, the Debtors estimate the costs that may be incurred under a warranty, with the exception of extended warranties, and record a liability for such costs. Some of the warranty reserves held by the Debtors relate to past recalls, which the Debtors continue to honor, and which the Debtors seek to continue honoring as part of their warranty program during these cases. Because the Debtors' warranty claims may extend far into the future, significant judgment is required in determining the likely cost of honoring warranties. The Debtors estimate that the cost of honoring all prepetition warranties under all of their warranty programs to be approximately $66,100,000, and the cost of honoring warranties during the two months following commencement of these cases to be approximately $6,300,000.

105. As part of honoring their warranties, the Debtors often provide new parts. The Debtors coordinate their shipments of warranty parts so that they arrive at the time when a repairman is scheduled to install the warranty part or otherwise fix a product. Such repairs are ongoing and a small number of them may require shipment of parts between the time the Debtors file their bankruptcy cases and the time the Court rules on the Customer Programs Motion. To avoid the possibility of incurring additional costs in honoring their warranties by not having warranty parts available when needed, and to avoid alienating customers due to such disruption, the Debtors intend to continue shipping their warranty parts without disruption, which may cause the Debtors to ship some parts between the time they file their cases and the time customer programs relief is entered by the Bankruptcy Court. The Debtors request that the authority to continue shipping warranty parts be granted *nunc pro tunc* to the Commencement Date to account for these shipments.

106. Offering and honoring warranties is essential to maintaining the Debtors' reputation for manufacturing safe, high quality products. If the Debtors were not permitted to honor their warranties, the Debtors' relationships with their customers would be harmed. Absent assurance that the Debtors have authority to honor their warranties, customers may avoid making future purchases from the Debtors. Customers that resell the Debtors' products to other end-users could also see their own goodwill damaged if the Debtors were to not honor warranties. Customers will seek to protect themselves, and their own relationships with their customers, by purchasing from producers who are able to warrant the quality of their products. The cost to the Debtors of losing future business, particularly from the Debtors' larger customers, far exceeds the costs of making customers whole for existing warranty claims. Therefore, the Debtors seek approval to pay the outstanding amounts required to honor the Debtors' warranties.

### Volume-Based Rebate Customer Programs

107. The Debtors enter into a variety of volume-based rebate agreements with their customers. These rebate agreements are typical of volume-based rebates in the home-building products industry, and incentivize the Debtors' customers to purchase a higher volume of goods and services from the Debtors by effectively discounting the price of goods when customer purchases exceed a specified threshold. The rebate may be structured in various ways, including by providing for future purchasing credits, a discount off of prices charged by the Debtors during the life of the contract, issuance of free goods or by refunding a portion of the purchase price once the customer either reaches a certain volume of products purchased or meets the sales growth target or sales quota specified in the specific customer arrangement. In certain cases, the volume-based rebate percentage may increase at different levels of sales volume achieved by the customer. Volume rebates are offered by Debtors in each of the Residential Ventilation Products, Home Technology Products and Residential HVAC segments. The

Commercial HVAC segment does not typically enter into such arrangements because most of its products are custom built.

108. As of the Commencement Date, the Debtors estimate that the amount of volume-based rebates relating to the prepetition periods that they will provide to customers is approximately $11,800.000.

### Cooperative Advertising and
### Other Marketing-Related Customer Programs

109. The Debtors may enter into cooperative advertising rebate arrangements whereby the Debtors reimburse the customer for certain advertising costs incurred by the customer with respect to the Debtors' products or whereby the Debtors provide a rebate to the customer as an allowance to cover advertising costs of the customer. For example, in the course of advertising for its own business, a home products retailer might advertise that it carries certain products produced by the Debtors. By creating name recognition and generating interest in the Debtors' products with end-users, the retailer's advertising can create demand for the Debtors' products. In some cooperative advertising arrangements the Debtors agree to provide a general advertising allowance to the retailer, with no specific obligations to use the funds for advertising. In these instances the allowance functions as a price reduction in favor of the customer. In other instances, however, the Debtors require the customer to submit an invoice detailing the advertising and its cost before the customer is entitled to reimbursement from the Debtors. The limits on cooperative advertising arrangements with the customers may either be a specified percentage of sales or a specified periodic amount on either a monthly, quarterly or annual basis. To encourage cooperative advertising, and to preserve relationships with customers who view cooperative advertising arrangements as part of the benefit of the bargain they struck when they entered into contracts to purchase the Debtors' products, the Debtors are seeking authority to

continue to honor cooperative advertising agreements. Cooperative rebates are offered by Debtors in each of the Residential Ventilation Products, Home Technology Products and Residential HVAC segments. The Commercial HVAC segment does not typically enter into such arrangements because most of its products are custom-built and therefore not generally advertised.

110.    The Debtors may enter into other marketing-related rebate arrangements with customers that provide customers with, among other things, reimbursements for customer promotions on behalf of the Debtors' products, reimbursement of customer trade show attendance or the development of marketing materials, such as catalogues or brochures, special promotion incentive funds to customers or employees of customers to sell certain of the Debtors' products, general marketing development funds, rebates in lieu of customer returns of product and other general customer rebates designed to promote the overall customer relationships. These types of rebates are generally determined either as a specified percentage of sales or as a specified periodic amount on either a monthly, quarterly or annual basis. Some forms of these type of rebates are offered by Debtors in each of the Residential Ventilation Products, Home Technology Products and Residential HVAC segments. The Commercial HVAC segment does not typically enter into such arrangements because most of its products are custom-built.

111.    As of the Commencement Date, the Debtors estimate that the amount of cooperative advertising and other marketing-related rebates relating to the prepetition periods that they will provide to customers is approximately $13,900,000.

**Customer Indemnity Programs**

112.    In certain instances the Debtors indemnify their customers against claims alleging that one of the Debtors' products infringes a patent. In such instances the Debtors may

also offer other remedies such as replacing, removing or modifying the product and/or refunding the purchase price to the customer. The Debtors have a strong interest in protecting their customers from such suits and in ensuring that a robust defense of the Debtors' intellectual property rights is made when and if such suits arise. Accordingly, the Debtors request authority to honor these indemnity obligations, and to pursue related remedies.

## Customer Programs Providing for
## Back Charges, Retainage, Contract Changes and Deposits

113.    In the Debtors' commercial HVAC segment, the Debtors manufacture and sell air conditioning and heating products that are custom-designed for use in commercial offices, manufacturing and educational facilities, hospitals, retail stores, clean rooms and government buildings. These systems are typically manufactured and assembled on the Debtors' premises before they are installed. When the Debtors agree to install these systems they often agree to "back charges" or "retainage." A back charge allows the customer to review the status of the project according to a "punch list" of items agreed upon by the Debtors and the customer, and to reduce the purchase price for items that are not completed to the satisfaction of the customer. In addition, many contracts provide for retainage by the customer of a specified percentage of amounts due to the Debtors until the satisfactory completion of the project. If a customer objects to the status of an item on the punch-list, the Debtors might allow the customer additional retainage while the Debtors rectify the punch-list item, rather than providing a purchase price reduction through a back charge. These customer protections are particularly important in the custom-built commercial HVAC industry because customers rely on the Debtors' satisfactory performance for the completion of their construction projects, as they may not be able to easily or inexpensively replace the Debtors as a supplier. Back charges and retainage give the Debtors a financial incentive to reach the end of a project, and to complete it

to the customer's satisfaction. As a result, these arrangements give customers confidence that the Debtors will complete their projects properly and enable the Debtors to win new business. The Debtors request authority to honor contractual arrangements providing for back charges and retainage according to their terms so that customers have confidence that these important protections remain available to them during these cases. As of the Commencement Date, the Debtors estimate that the amount of potential back charges that they may need to honor is approximately $1,500,000.

114. Similarly, many of the Debtors' contracts in the commercial HVAC segment contain terms governing requests by the customer to make changes to the equipment or services that the customer ordered (each a "*Change Order*"). Such provisions enable the Debtors to adapt to customer needs as they evolve during the course of a construction project. Typically the Debtors have the ability to alter the price as a result of such changes, but in some cases the Debtors may agree, in their business judgment, to changes which, on the whole, either increase the Debtors' performance burden or lower the price paid by the customer. Nonetheless, such adaptations are expected by customers and are common in the industry. The Debtors request authority to continue evaluating and entering into Change Orders consistent with their prepetition practices, regardless of whether Change Orders cause the alteration of a prepetition contract in ways that lower the Debtors' earnings on the contract or increase the cost of the Debtors' performance.

115. The Debtors often require advance payments from customers to protect themselves in the event that a customer fails to perform. This is particularly common on large commercial HVAC projects where the Debtors manufacture custom products which they may not be able to resell and on sales of residential HVAC equipment to international customers. As

of the Commencement Date, the Debtors estimate that they hold approximately $3,200,000 in accrued deposits, representing amounts customers have paid to the Debtors to secure future performance. The Debtors request authority to honor these deposits according to their terms, including by returning the deposits to customers. If the Debtors do not honor the terms of agreements by which they accepted and hold customer deposits, they will undermine the trust of their customers, will likely lose business, and will have difficulty convincing customers to provide future deposits.

### Customer Refunds, Returns and Allowances for Credit, Exchanges, Billing, Shipping and Other Normal Course Customer Obligations

116. In the normal course of their businesses the Debtors invoice their customers and provide refunds, credits for returns and allowances or exchanges for products sold where they are either obligated to do so according to their agreements or common practices with their customers, or where the Debtors determine, in their business judgment, that such accommodations are otherwise appropriate. With respect to the Debtors' customers that are retail outlets, the Debtors may also provide a refund to the retailer after the retailer accepts returns of the Debtors' products from the retailer's customers, even though the Debtors do not control when the retailer accepts returned products, and typically do not receive the returned product. In addition, certain of the Debtors have customer agreements that allow, under certain conditions, cancellation of customer orders, or the return of the customer's unsold stock of the Debtors' products.

117. In addition, the Debtors routinely correct billing errors – including errors whereby a customer overpays or is invoiced a greater amount than they should pay – by reimbursing the customer the overpaid amount or by crediting the customer's account. To maintain normal billing procedures and protect their vital relationships with their customers

during these cases, the Debtors request that the Court permit them to honor all of their prepetition refund, exchange and billing practices, even where such practices may lead to refund of estate funds on account of a prepetition claim or prepetition overpayment. Similarly, the Debtors request that the Court permit them to perform their obligations to any customer that has prepaid prior to the Commencement Date for any goods or services offered by the Debtors, including for additional services (such as shipping) that the Debtors sometimes provide or pay for. As of the Commencement Date, the Debtors estimate that the amount of potential returns and allowances due under these programs that the Debtors may need to honor is approximately $17,900,000.

### Summary of Estimated Costs under the Customer Programs

118. The Debtors estimate that the cost of honoring pre-petition obligations under their Customer Programs will be approximately $114,400,000, and the cost of honoring such programs during the two months following commencement of these cases to be approximately $27,700,000. The Debtors estimate that the cost of honoring their Customer Programs in the twenty (20) days after filing these cases to be approximately $11,200,000.

119. The Customer Programs are integral to the Debtors' efforts to stabilize their businesses, restore vitality, and ultimately deliver the most value to all stakeholders in the Debtors' chapter 11 cases. I believe that the Debtors must promptly assure customers of their continued ability to satisfy prepetition and postpetition obligations under the Customer Programs to maintain their valuable customer base, and capture the myriad other important benefits derived therefrom, following the commencement of these chapter 11 cases.

**I.      Debtors' Motion Pursuant to Sections 105, 361, 362, 363 and 507 of the Bankruptcy Code for Authority to (I) Use Cash Collateral, (II) Grant Adequate Protection, and (III) Modify the Automatic Stay**

120.      By this motion (the "*Cash Collateral Motion*"), the Debtors request, pursuant to sections 105, 361, 362, 363 and 507 of the Bankruptcy Code, entry of proposed interim order (the "*Cash Collateral Order*") authorizing the Debtors to use cash collateral, grant adequate protection to their secured lenders, and modify the automatic stay to the extent necessary to effectuate the use of cash collateral.

121.      The ability of the Debtors to operate their businesses requires the use of cash collateral, absent which immediate and irreparable harm would result to the Debtors, their estates, and their creditors, and the possibility for a successful chapter 11 case. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses in the ordinary course or to maintain their property without the use of cash collateral. The relief requested in the Cash Collateral Motion is therefore necessary for the continued operation of the Debtors' businesses and the preservation of their property. The Prepetition Agents (as defined in the Cash Collateral Motion), the Prepetition Lenders (as defined in the Cash Collateral Motion), and the Debtors have negotiated at arm's length and in good faith regarding the Debtors' use of cash collateral to fund the continued operation of the Debtors' businesses during the short timeframe of these chapter 11 cases.

122.      Accordingly, I believe that the relief requested in the Cash Collateral Motion for authority to use cash collateral is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate and reorganize their businesses during these prepackaged chapter 11 cases without disruption.

**J.**     **Debtors' Motion Pursuant to Sections 331 and 105(a) of the Bankruptcy Code for Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals**

123.    The Debtors request, pursuant to section 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a), entry of an order establishing procedures for the compensation and reimbursement of attorneys and other professionals whose retentions are approved by this Court pursuant to section 327 or 1103 of the Bankruptcy Code on terms that satisfy the requirements of Local Bankruptcy Rule 2016-2. Such an order will streamline the professional compensation process and enable the Court and all other parties to effectively monitor the professional fees incurred in these chapter 11 cases.

124.    The Debtors' chapter 11 cases present a number of complex issues that, together with the day-to-day administration of the chapter 11 cases, must be addressed by the Debtors' limited staff and resources. In addition, it is anticipated that a number of professionals will be involved. Absent streamlined compensation procedures, the professional fee application and review process could be exceptionally burdensome on the Debtors, the professionals, the Court, and other parties.

125.    I believe that the proposed interim compensation procedures for the Debtors' professionals are in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate, and effectively reorganize, their business in chapter 11 without disruption.

**K.**     **Motion of Debtors Pursuant to Bankruptcy Rules 1007(c) and 2002(d) and Local Rule 1007-1(b) for an Extension of the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Final Affairs**

126.    The Debtors request, pursuant to section 521 of the Bankruptcy Code and Rule 1007(c) of the Bankruptcy Rules and Local Rule 1007-1(b), an extension of time to file

their (a) schedules of assets and liabilities; (b) schedules of current income and expenditures; (c) schedules of executory contracts and unexpired leases; and (d) statements of financial affairs (collectively, the "*Schedules and SOFAs*").

127.    Due to the demands on the limited resources available to the Debtors at this time, the Debtors anticipate that they will be unable to complete their Schedules in the mere thirty (30) days provided by the Bankruptcy Rules. To prepare the Schedules, the Debtors must compile information from their books, records, and other sources relating to their assets, contracts, and creditors. Assembling the necessary information will be a significant task for the Debtors. Therefore, the Debtors are requesting a forty-eight (48) day extension of the applicable time period to a total of seventy-eight (78) days after the Commencement Date.

128.    Accordingly, I respectfully submit that in light of (i) the large amount of information that must be assembled and compiled, (ii) the significant amount of employee time that must be devoted to the task of completing the Schedules and SOFAs, and (iii) the many pressing items that must be addressed at the inception of these cases, ample cause exists for the Court to grant the requested extension for filing their Schedules and SOFAs.

**L.    Debtors' Application Pursuant to Section 156(c) of the Judicial Code and Local Rule 2002-1(f) for Authorization to (I) Employ and Retain Epiq Bankruptcy Solutions, LLC as Claims and Noticing Agent for the Debtors and (II) Appoint Epiq Bankruptcy Solutions, LLC as Agent of the Bankruptcy Court**

129.    Section 156(c) of title 28 of the United States Code, which governs the staffing and expenses of the Bankruptcy Court, authorizes the Court to use facilities other than those of the Clerk's Office for the administration of chapter 11 cases. It provides:

> [a]ny court may utilize facilities or services, either on or off the court's premises, which pertain to the provision of notices, dockets, calendars, and other administrative information to parties in cases filed under the provisions of title 11, United States Code,

where the costs of such facilities or services are paid for out of the assets of the estates and are not charged to the United States.

130. Moreover, Local Rule 2002-1(f) requires, in all cases with more than 200 creditors, that the debtor file a motion to retain a noticing agent on the first day of the case or within ten (10) days thereafter.

131. The Debtors estimate that there are in excess of 1,000 creditors in these chapter 11 cases. Although the Debtors do not anticipate establishing a bar date, it is possible that some creditors will file proofs of claim. Noticing, receiving, docketing and maintaining of proofs of claims in this volume and, more importantly, noticing the large number of interested parties in these cases would be unduly time consuming and burdensome for the Clerk's Office.

132. Accordingly, the Debtors believe that the retention of Epiq Bankruptcy Solutions, LLC ("*Epiq*") as the Court's outside agent is in the best interest of their estates and parties in interest. Epiq is a nationally recognized specialist in chapter 11 administration and has vast experience in noticing and claims administration in chapter 11 cases, including the recent chapter 11 cases of Chrysler, LLC; Finlay Enterprises, Inc.; Lehman Brothers Holdings Inc.; and Steve & Barry's Manhattan LLC.

**M. Motion for an Order (I) Scheduling a Combined Hearing to Consider (A) Approval of the Disclosure Statement, (B) Approval of Solicitation Procedures and Forms of Ballots, and (C) Confirmation of the Prepackaged Plan; (II) Establishing an Objection Deadline to Object to the Disclosure Statement and the Prepackaged Plan; (III) Approving the Form and Manner of Notice Thereof; and (IV) Granting Related Relief**

133. By this motion (the "*Scheduling Motion*"), the Debtors seek entry of a scheduling order (I) scheduling a combined hearing (the "*Combined Hearing*") to consider (a) approval of the Disclosure Statement; (b) approval of the Solicitation Procedures (defined below) employed to solicit votes to accept or reject the Prepackaged Plan pursuant to Bankruptcy Rule 3017(a) and the forms of Ballots (defined below); and (c) the confirmation of the

Prepackaged Plan pursuant to section 1128 of the Bankruptcy Code and Rule 3017(c) of the Bankruptcy Rules; (II) establishing an objection deadline to object to the adequacy of the Disclosure Statement or confirmation of the Prepackaged Plan; (III) authorizing and approving the form and manner of notice of the Combined Hearing; and (IV) granting related relief.

134.    Below is a table highlighting the dates relevant to the Solicitation of the Prepackaged Plan and setting forth the Debtors' proposed dates for the mailing of the Summary and Notice (as defined below), the Combined Hearing, and the Objection Deadline:

| Proposed Timetable | |
|---|---|
| Commencement of Solicitation | September 18, 2009 |
| Voting Deadline | October 16, 2009 |
| Commencement Date | October 21, 2009 |
| Mailing of Summary and Notice | October 29, 2009 |
| Objection Deadline | November 23, 2009 |
| Reply Date (if any) | December 1, 2009 |
| Combined Hearing | December 4, 2009 |

135.    The most sensitive and complex task required to effectuate a successful reorganization – the negotiation of consensual agreements with critical creditor constituencies – has already been accomplished in advance of the Commencement Date. As set forth above, the Debtors solicited votes on the Prepackaged Plan from all classes of holders of claims entitled to vote to accept or reject the Prepackaged Plan. The votes tabulated and received from these classes are sufficient to confirm the Prepackaged Plan. Thus, the Debtors respectfully submit that there is no reason to delay consideration of the adequacy of the Disclosure Statement and confirmation of the Prepackaged Plan. Moreover, it is in the best interests of the Debtors' estates and creditors to proceed with the confirmation process as expeditiously as possible.

136.    Accordingly, the Debtors respectfully request that the Court schedule the Combined Hearing to be held as soon as practicable but on not less than twenty-five (25) days'

notice. Specifically, the Debtors respectfully request the Court schedule the Combined Hearing for December 4, 2009. The proposed schedule is in the interests of all parties in interest in the Debtors' Reorganization Cases. The requested relief is necessary to the efficient prosecution of these chapter 11 cases and will assist in the expeditious confirmation of the Prepackaged Plan while providing adequate notice to, and protecting the rights of, creditors. In addition to the reasons set forth above, it is appropriate that a scheduling order be entered at this time so that creditors may be informed as promptly as possible of the anticipated scheduling of events preceding confirmation of the Prepackaged Plan that they have voted to accept. The proposed schedule affords creditors and all other parties in interest ample notice of the proceedings. Insofar as the solicitation period was completed prior to the Commencement Date, and the proposed schedule affords an additional twenty-five (25) days in which parties may evaluate the Prepackaged Plan prior to the proposed Combined Hearing thereon, no party in interest will be prejudiced by the relief requested in the Scheduling Motion. Such relief allows for more than ample time for parties to evaluate the Disclosure Statement and Prepackaged Plan prior to the Combined Hearing.

137.    The Debtors request that at the Combined Hearing the Court consider approval of the solicitation, balloting, tabulation and related activities undertaken in connection with the Prepackaged Plan, all of which were undertaken and substantially completed prior to the Commencement Date (collectively, the "*Solicitation Procedures*").

138.    The Debtors respectfully request that the Court set a date that is at least twenty-five (25) calendar days after the mailing of the Summary and Notice (as defined below) as the last date to file objections to approval of the Disclosure Statement or confirmation of the Prepackaged Plan (the "*Objection Deadline*"). This date will provide creditors and holders of

equity interests twenty-five (25) days' notice of the deadline for filing objections to the Disclosure Statement and the Prepackaged Plan, while still affording the Debtors and other parties in interest time to file a responsive brief and, if possible, resolve any objections received. The Debtors also request that the Court set any reply deadline at least five (5) business days after the objection deadline.

139.  The Debtors further request that the Court direct that any objections to the Disclosure Statement or Prepackaged Plan be in writing, filed with the Clerk of the Court together with proof of service thereof, set forth the name of the objector, and the nature and amount of any claim or interest asserted by the objector against the estate or property of the Debtors, and state the legal and factual basis for such objection and be served upon the parties specified in the Scheduling Motion so as to be received no later than 4:00 p.m. Eastern time on November 23, 2009.

140.  The Debtors propose to serve a notice and summary of the Prepackaged Plan (the "*Summary and Notice*"), substantially in the form annexed as Exhibit "1" to the proposed scheduling order, by first-class mail or deposit with a reputable overnight delivery service on or before October 29, 2009 upon all parties in interest.  The Summary and Notice contains, *inter alia*: (i) the date, time, and place of the Combined Hearing; (ii) instructions for obtaining copies of the Disclosure Statement and Prepackaged Plan; (iii) the Objection Deadline and the procedures for filing objections to the Disclosure Statement and the confirmation of the Prepackaged Plan; and (iv) notice of commencement of these chapter 11 cases.

141.  In addition, I am informed that Bankruptcy Rule 2002(l) permits a court to "order notice by publication if it finds that notice by mail is impracticable or that it is desirable to supplement the notice."  The Debtors request that this Court authorize them, in their discretion,

to give supplemental publication notice of the Combined Hearing in on a date no less than 25 days prior to the Combined Hearing. I believe the proposed notice schedule and publication affords parties in interest ample notice of these proceedings.

142. The Debtors request that the Court also determine that they are not required to distribute copies of the Prepackaged Plan or the Disclosure Statement to any holder of a claim against or equity interest in the Debtors within a class under the Prepackaged Plan that is deemed to accept or is deemed to reject the Prepackaged Plan, unless such party makes a specific request in writing for the same. In lieu of furnishing each such holder of a claim against or equity interest in the Debtors that is either deemed to accept or is deemed to reject the Prepackaged Plan with a copy of the Prepackaged Plan and the Disclosure Statement, the Debtors propose to send to such parties the Summary and Notice, which sets forth the manner in which a copy of the Prepackaged Plan and the Disclosure Statement may be obtained. Accordingly, the Debtors submit that such notice satisfies the requirements of Bankruptcy Rule 3017(d).

143. As set forth above, all but one of the classes consisting of holders of claims materially affected by the Prepackaged Plan have already accepted the Prepackaged Plan in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code. The Prepackaged Plan contemplates an expeditious emergence from chapter 11 and the Debtors intend to proceed accordingly. The Debtors submit that cause exists for this Court to direct the United States Trustee not to convene a meeting of creditors or equity security holders unless the Prepackaged Plan is not confirmed within ninety (90) days after the Commencement Date.

144. In light of the prepackaged nature of these cases, the acceptances received from all but one impaired class, and the short duration of time which the Debtors expect to be in

bankruptcy, I believe the relief requested in the Scheduling Motion is in the best interests of the Debtors, their creditors, and all parties in interest and, therefore, the Scheduling Motion should be granted.

## Conclusion

145.    The requested relief in all of the First Day Motions is further supported by the prepackaged nature of these cases. As set forth above and in the FBG Affidavit, the Debtors solicited votes on the Prepackaged Plan from all classes of holders of claims entitled to vote to accept or reject the Prepackaged Plan. The votes tabulated and received from these classes are sufficient to confirm the Prepackaged Plan. The most critical and complex task required to effectuate a successful reorganization – the negotiation and formulation of a chapter 11 plan of reorganization – has already been accomplished. Thus, the Debtors respectfully submit that

given the backdrop of these prepackaged chapter 11 cases, the relief requested in the First Day Motions is appropriate inasmuch as such relief will assist the Debtors to move towards expeditious confirmation of the widely-supported Prepackaged Plan with the least possible disruption or harm to their businesses. An expeditious confirmation is in the best interests of the Debtors' estates and creditors. The Debtors typically enter into new agreements for the spring and summer construction season near the end of the preceding calendar year. Accordingly, an extended chapter 11 case may jeopardize customers' confidence in the Debtors at a critical juncture in their business cycle, which will adversely affect the Debtors' ability to reorganize effectively and emerge from chapter 11 postured for future growth. Moreover, the relief requested is supported by the Debtors' major creditor groups. Based on the foregoing, I believe that the relief requested in the First Day Motions is necessary and appropriate, is in the best interests of the Debtors' estates and creditors, and should be granted in all respects.

146.    I respectfully request that the Court grant all relief requested in the First Day Motions and such and other and further relief as may be just.

Dated: October 21, 2009
       Providence, Rhode Island

NTK HOLDINGS, INC.
(for itself and on behalf of its affiliated Debtors and Debtors in Possession)

By: /s/ Richard L. Bready
Richard L. Bready
Chief Executive Officer of NTK Holdings, Inc.,
    Nortek Holdings, Inc., and Nortek, Inc.