# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
---------------------------------------------------------------x
                                        :
```

*In re*  :  **Chapter 11**

: 

**NTK HOLDINGS, INC., *et al.*,**[1]  :  **Case No. 09 –13611 (KJC)**

: 

**Debtors.**  :  **(Jointly Administered)**

: 

```
---------------------------------------------------------------x
```

## DECLARATION OF TIMOTHY R. COLEMAN IN SUPPORT OF CONFIRMATION OF THE DEBTORS' FIRST AMENDED JOINT PREPACKAGED PLANS OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

TIMOTHY R. COLEMAN declares pursuant to section 1746 of title 28 of the United States Code that:

1.      I am a Senior Managing Director of Blackstone Advisory Partners L.P. (formerly, Blackstone Advisory Services L.P.) ("*Blackstone*"), an operating subsidiary of The Blackstone Group L.P. ("*The Blackstone Group*"), a global alternative asset manager and provider of financial advisory services listed on the New York Stock Exchange which has its principal office at 345 Park Avenue, New York, New York 10154. I submit this Declaration in support of confirmation of the Debtors' First Amended Joint Prepackaged Plans of Reorganization, dated as of October 22, 2009 (the "*Plan*").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: NTK Holdings, Inc. (4298); Nortek Holdings, Inc. (9907); Nortek, Inc. (4991); Aigis Mechtronics, Inc. (6764); Broan-Mexico Holdings, Inc. (1438); Broan-NuTone LLC (4397); Broan-NuTone Storage Solutions LP (4328); CES Group, Inc. (5781); CES International Ltd. (6119); Cleanpak International, Inc. (2925); Elan Home Systems, L.L.C. (7629); Gefen, Inc. (1217); Governair Corporation (1240); GTO, Inc. (6645); HC Installations, Inc. (0110); Huntair, Inc. (2838); International Electronics, LLC (4321); Linear LLC (9070); Linear H.K. LLC (9638); Lite Touch, Inc. (0152); Magenta Research Ltd. (5160); Mammoth-Webco, Inc. (3077); Niles Audio Corporation (2001); Nordyne Inc. (4381); NORDYNE International, Inc. (7842); Nortek International, Inc. (0717); NuTone LLC (9551); OmniMount Systems, Inc. (7936); Operator Specialty Company, Inc. (6248); Pacific Zephyr Range Hood, Inc. (8936); Panamax Inc. (0890); Rangaire GP, Inc. (4327); Rangaire LP, Inc. (9900); Secure Wireless, Inc. (2485); SpeakerCraft, Inc. (6374); Temtrol, Inc. (3996); Xantech Corporation (1552); and Zephyr Corporation (1650). The Debtors' principal offices are located at 50 Kennedy Plaza, Suite 1900, Providence, Rhode Island 02903. The addresses for all of the Debtors are available at the website chapter11.epiqsystems.com/nortek.

2.     I have reviewed and am familiar with the terms and provisions of the Plan and the Disclosure Statement for the Plan (the "*Disclosure Statement*").[2] Except as otherwise indicated, all facts set forth in this Declaration are based upon: (a) my personal knowledge; (b) my corporate finance and restructuring experience; (c) information concerning the operations and finances of the Debtors; (d) my review of relevant business records of the Debtors; and (e) information provided to me by Blackstone employees working under my supervision. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

### Qualifications Of Declarant And Blackstone

3.     Blackstone offers a variety of advisory services to our clients, including an extensive practice in advising large companies contemplating restructurings of their financial obligations either out-of-court or in a chapter 11 proceeding. Blackstone professionals have extensive experience working with financially troubled companies in complex financial restructurings. Since 1991, Blackstone has advised on more than 245 distressed situations, both in and out of bankruptcy proceedings, involving more than $945 billion of total liabilities.

4.     I have worked at Blackstone since 1992. Prior to my employment with Blackstone, I held various positions involving corporate finance and restructuring at Citibank, N.A. for more than 12 years. I earned a Bachelor of Arts degree from the University of California at Santa Barbara and a Master of Business Administration degree from the University of Southern California. I have previously worked on many chapter 11 restructurings, advising both debtors and creditors in various cases, and have extensive experience working with companies in distressed situations. Advisory assignments in which I have been actively involved include, among others, ACA Capital Holdings, Inc., Adelphia (for AT&T Broadband), Adelphia

---

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan and the Disclosure Statement.

(for Comcast), Alestra (for AT&T), Alliance Entertainment Corp., Allied Capital Corporation, AT&T Canada (for AT&T), Barneys, Inc., Bear Stearns Asset Management, Bidermann (Court), Cable & Wireless Holdings, Inc., Cellnet Data Systems, Inc., Credit-Based Asset Servicing and Securitization, Delta Air Lines, Inc., Ermis Maritime Shipping, Excite@Home (for AT&T), Financial Guaranty Insurance Company, FLAG Telecom, Ford Motor Company, Geneva Steel Company, Global Power Equipment Group, Inc., Guangdong Enterprises, Joy Global, Inc., Harrah's Jazz Company, Hercules, Inc., Inc., JPS Textile Group, Inc., Koll Real Estate (Board), Mirant Corp., MoneyGram International, Inc., Natural Products, LLC, RCN Corp., R.H. Macy & Co., Russell-Stanley Holdings, Inc., Safelite Glass Corp., Stratosphere Corporation, Sunbeam (Board), TOUSA, Inc., Vencor, Inc., Williams Communications Group, Inc., Xerox Corp., and XL Capital. Ltd.

### Blackstone's Role In Advising The Debtors

6.    Blackstone was retained by Weil, Gotshal & Manges LLP ("*WG&M*") on behalf of the Debtors on June 17, 2009. However, Blackstone has been following the Debtors since late 2008, and was involved in various meetings and discussions with the Debtors beginning in April 2009 prior to our official engagement. I have served as the leader of the Blackstone team throughout the engagement. In connection with this assignment, Blackstone has analyzed the Debtors' liquidity, current and projected operating performance, and overall business plan in order to advise them on restructuring alternatives. Blackstone also provided numerous other services including (a) analyzing the Debtors' financial projections (the "*Projections*"), (b) assisting in the formulation of the Plan and the related Disclosure Statement, (c) preparing valuation analyses (the "*Valuation*") upon which creditor recoveries are based, and (e) providing other financial and business assistance, such as negotiating with various creditor groups, including the ad hoc committee of holders of unsecured bonds and the ABL revolving

3

credit facility lenders. As a result of these services, Blackstone has become familiar with the Debtors' capital structure, businesses, operations and affairs and has advised and assisted the Debtors on many of the financial and restructuring issues prior to and during these Chapter 11 Cases.

7.      Blackstone helped develop the Plan by regularly reviewing management's underlying assumptions regarding specific business initiatives and restructuring priorities. Through its work with the Debtors, Blackstone is familiar with the material provisions of the Plan and the restructurings embodied therein.

8.      Although Blackstone assumed and relied upon the accuracy and completeness of the Projections and other financial information provided to it by the Debtors, Blackstone has reviewed the financial data and assumptions underlying the Projections and believes that reliance on the Projections as a basis for the reorganization plan is reasonable.

9.      In determining the value of the Debtors, Blackstone utilized the following standard valuation methods, each of which is discussed further below: (i) a Discounted Cash Flow method (as defined below); (ii) a Comparable Company method (as defined below); and (iii) a Precedent Transaction method (as defined below).

10.      In conjunction with preparing the Valuation, Blackstone undertook actions we deemed necessary and appropriate to perform the work required. Among other things, Blackstone:

        (a)      conducted interviews and discussions with certain members of the Debtors' management team ("*Management*") including: Richard L. Bready (Chairman, President and Chief Executive Officer); Almon C. Hall (Vice President and Chief Financial Officer); Kevin W. Donnelly (Vice President, General Counsel and Secretary); Andrew Prete (Senior Legal Counsel); Edward J. Cooney (Vice President and Treasurer); and Michael Botelho (Senior Manager, Business Development & Strategic Planning).

4

(b)    met with Management at the Debtors' corporate headquarters in Providence, Rhode Island on multiple occasions, and conducted numerous calls to discuss operations, capital structure considerations, future prospects, and other matters;

(c)    reviewed certain internal financial and operating data of the Debtors, including projections provided by Management relating to the Debtors' businesses and prospects;

(d)    conducted site tours at various locations;

(e)    reviewed documents, presentations, analyses, and other relevant materials received from the Debtors and their outside financial and legal advisors;

(f)    reviewed publicly available financial data and considered the market value of public companies that Blackstone deemed generally comparable to the operating businesses of the Debtors;

(g)    considered certain economic and industry information relevant to the Debtors' operating businesses; and

(h)    conducted such other studies, analyses, inquiries and investigations as Blackstone deemed appropriate.

12.    It should be noted that Blackstone has relied on the accuracy and completeness of the information provided by the Debtors, and did not make any independent appraisal of the Debtors' assets. The valuation conclusions detailed herein are based on financial projections provided by the Debtors.

13.    In addition to preparing the Valuation for the Debtors, Blackstone also reached out to the Debtors' major bondholders to organize them and gain additional insight into their expectations in a restructuring. Blackstone had significant contact with certain holders and their outside advisors of the Nortek 10% Senior Secured Notes due 2013 (i.e., Nortek Class 3, or the "10% Notes"), Nortek 8½% Senior Subordinated Notes due 2014 (i.e., Nortek Class 5, or the "8½% Notes"), and the NTK Holdings 10 ¾% Senior Discount Notes due 2014 (i.e., NTK Holdings Class 2, or the "10 ¾% Notes"), all of whom are Impaired Classes entitled to vote under the Plan. Collectively, this group (also known as the *"Ad Hoc Committee"*) owns over

65% of the 8½% Notes, over 40% of the 10% Notes, and over 55% of the 10¾% Notes. Blackstone also maintained an active dialogue with other holders of 10% Notes who were not a part of the Ad Hoc Committee, as well as certain holders of the NTK Holdings Senior Unsecured Loan due 2014 (i.e., NTK Holdings Class 3, or the "NTK Holdings Senior Unsecured Loan").

14.     Based on the foregoing, Blackstone prepared the Valuation for the purpose of estimating value available for distribution to holders of Claims (collectively, the *"Creditors"*) pursuant to the Plan and to analyze the relative recoveries to Creditors thereunder. The estimated total value available for distribution to holders of allowed claims is comprised of an estimated value of the Reorganized Debtors' operations on a going concern basis (the *"Enterprise Value"*). Based on the Projections supplied by the Debtors at that time, the Debtors have an Enterprise Value between $1.0 billion and $1.3 billion. The estimated new equity value available for distribution (the *"New Equity Value"*) is estimated to range from approximately $172 million to $472 million.[3]

15.     Blackstone delivered its conclusions regarding the Reorganized Debtors' Enterprise Value to the board of directors of the Debtors (the *"Board of Directors"*) on July 30, 2009.[4] To the best of my knowledge, nothing has occurred in the markets since then which would materially alter either the results of the Reorganized Debtors' Enterprise Value or the estimated recoveries to Creditors.

---

[3] The New Equity Value range of $172 - $472 million is calculated as Enterprise Value less pro forma net debt at 12/31/09 of $828 million (sum of: $50 million subsidiary level debt, $135 million of drawn debt on the ABL Facility, and $750 million of the 10% Notes, less $107 million of cash).

[4] The July 30, 2009 presentation to the Board of Directors was based on the Projections, which incorporated actual results for the Debtors through April 2009. On August 24, 2009, in a form 8-K, the Debtors provided guidance for 2009 EBITDA of $139-149 million (adjusted for the add-back of a non-cash goodwill impairment charge and certain other income and expense items). Since July, it has become apparent that actual revenues will be lower than the Projections, and that actual EBITDA will be at the higher end of the guidance range due to cost saving efforts. However, I am not aware of any information that would materially change the projections and forecasts for 2010 through 2014 that underlie the Valuation.

6

**Macroeconomic And Other Challenges To The Debtors' Business**

16.     The Debtors' business has been in decline for a period since at least 2008 and is continuing to decline. The Debtors have experienced declines in revenue and adjusted earnings before interest, taxes, depreciation and amortization ("*EBITDA*")[5] due to, among other things, trends in the home construction business, general macroeconomic conditions, and other factors. The severity of the worldwide crisis in the credit and financial markets in the second half of 2008 and the first half of 2009, the instability in the troubled mortgage market, the historical drop in home values and massive levels of existing home inventory, the continuing rising unemployment figures and declines in consumer disposable income all have led to material reductions in residential new construction activity and spending on home remodeling and repair projects, negatively impacting the Debtors' operating results. *See* Bready First Day Decl. ¶ 25.

17.     Total housing starts in the United States declined 25% in 2007 over 2006, further declined 33% in 2008 and by 48% in the first half of 2009. U.S. private residential construction spending (including home improvement spending) declined by 20% in 2007, 29% in 2008 and 33% for the first six months of 2009. In addition, industry central air conditioning and heat pump shipments declined 18% in 2006, 9% in 2007, 9% in 2008 and a further 18% in the first half of 2009. These factors have had an adverse effect on the Debtors' operating results, which is expected to continue for the duration of 2009 and for parts of 2010. *See* Bready First Day Decl. ¶ 25.

18.     Further, as a result of their highly levered capital structure, the Debtors have substantial debt service obligations, and particularly significant near-term obligations in

---

[5] Excludes goodwill impairment and certain other unusual income expense items. Also adjusted for one-time items related to the restructuring.

2010. At the end of the second quarter of 2009, based on the Debtors' EBITDA over the last 12 months, the Debtors and their foreign subsidiaries are extremely over levered with a total leverage ratio of 15.9x and a cash interest coverage ratio of 1.0x. As of July 4, 2009, the Debtors and their foreign subsidiaries had cash and cash equivalents of $172.8 million and Excess Availability (as defined in the ABL Facility Agreement) under the ABL Facility of approximately $75 million.[6] Under the terms of the 10 ¾% Notes, NTK Holdings would have to pay $162.3 million in cash debt service obligations in 2010, including a requirement to make a principal payment of $147.4 million on the 10¾% Notes on March 1, 2010. In its 10-Q filing for the quarter ended April 4, 2009, NTK Holdings expressed its belief that there was a substantial likelihood that it would not be able to make its cash debt service payments in 2010, including the principal payment on the 10 ¾% Notes due in March 2010. *See* Bready First Day Decl. ¶¶ 26-27. Additionally, interest payments of $26.6 million and $37.5 million were due from Nortek Inc. to holders of the 8 ½% Notes and 10% Notes on September 1, 2009 and December 1, 2009, respectively.

19.     While the Debtors have additional credit available to them under their existing ABL Facility, the current agreement contains a springing Consolidated Fixed Charge Ratio covenant such that if Excess Availability (as defined in the ABL Facility) is less than $40 million, Nortek must maintain a fixed charge ratio, which is not less than 1.1x. Based on the Debtors' estimates, even if they utilized their availability under the ABL Facility to fund some of their near-term debt obligations, they would fail the consolidated fixed charge ratio covenant and be in default under the ABL Facility. In light of the Debtors' financial constraints, and as part of the Debtors' strategy to preserve and enhance their near-term liquidity given the absence of an

---

[6] However, at 2009 year-end (12/31/09), as per the Disclosure Statement, the Debtors' cash balance is estimated to be $107 million.

imminent rebound in operating performance due to the historic macroeconomic downturn, Nortek elected to forgo making the interest payment which was due on their 8 ½% Notes on September 1, 2009. The Debtors believed it to be imprudent to drain liquidity in order to fund interest payments on notes that would likely be impaired in the financial restructuring. *See* Bready First Day Decl. ¶ 27.

**The Debtors' Business Plan Assumptions**

20.     Insofar as the Debtors' business is closely tied to macroeconomic factors, it is estimated that the Debtors' business will recover as the economy recovers. The Debtor's model underlying our Valuation assumes a downward outlook for the remainder of 2009 due to (i) anemic new housing starts and the large inventory of unsold and foreclosed homes, (ii) a challenging environment for existing home sales and (iii) decreased discretionary spending by consumers and businesses. The Debtors expect U.S. housing starts – a key driver of demand for their products – to bottom out in 2009 and achieve recovery growth of over 20% per year beginning in 2010 and continuing through the forecast period. While residential fixed investment is also expected to resume growth in 2010, non-residential (i.e., commercial) construction is not expected to increase until 2011. Since the time that the Projections were developed, the outlook for existing home sales has slightly improved, but commercial real estate has further deteriorated and is expected to decline further in 2010. As stated previously, the combined effects of these developments would not materially alter the Reorganized Debtors' Enterprise Value.

21.     The Debtors' business plan represents their outlook for 2009 through 2014. Revenues are driven by housing starts, existing home sales, and investment in residential improvements and non-residential construction activity. Residential Ventilation Products ("*RVP*"), Home Technology Products ("*HTP*") and Residential HVAC ("*R-HVAC*") sales are

expected to fall by 18%, 23% and 14%, respectively. Commercial HVAC ("*C-HVAC*") sales are expected to decline by approximately 23% as non-residential spending contracts and a large project in the Middle East are not replicated. In total, the Debtors' revenues are expected to decrease from $2.3 billion in 2008 to $1.8 billion in 2009.

22.     With respect to the Debtors' forecast for 2010 to 2014, revenues are projected to increase from $1.9 billion to $2.5 billion (CAGR: +6.5%), driven by stabilization of the residential marketplace and increased consumer discretionary spending. Forecasted overall growth of 4.7% in 2010 is estimated to be driven by a turnaround in the demand for the Debtors' residential-related products, particularly RVP (+9.6%) and HTP (+7.7%). Forecasted overall growth of 9.0% in 2011 is projected to result from the expected normalization of housing starts for R-HVAC (+11.7%), continued strength for RVP (+9.6%) and minor improvement in the investment environment of C-HVAC's end markets (+5.7%). Overall growth is projected to be stable for 2012 through 2014 at 5% to 6% per year.

23.     Further, the Debtors' gross margins are expected to increase from 26.5% in 2009 to 28.0% in 2014, driven by operating leverage partially offset by increased materials expense. The Debtors' EBITDA margins are forecast to rise from 7.4% in 2009 to 10.1% in 2014. Nortek is currently implementing an SG&A reduction program that management expects will reduce annual expenditures by approximately $60 million. Following these initiatives, SG&A expenditures are expected to grow approximately 3% to 5% per year.

24.     Based on the foregoing, the Debtors are expected to achieve recovery in revenue and margins beginning in 2010. However, while expected financial performance is

forecasted to rebound with a broader economic recovery, the Debtor's forecasted EBITDA is not expected to return to 2006 levels, the height of the housing bubble, in the Projections.[7]

**Calculating The Enterprise Value Of The Debtors**

25. Blackstone primarily relied on three valuation methodologies in preparing the Valuation, which reflects the going concern value of the Debtors after giving effect to the implementation of the Plan. Specifically, Blackstone determined the value of the Company using (i) a discounted cash flow analysis, in which Blackstone estimated the present value of the projected future cash flows to be generated by the Debtors, based on the Debtors' financial projections for the fiscal years 2009 through 2014 (the "*DCF Method*"), (ii) a comparable company analysis, which entails determining key operating statistics of the Debtors and multiplying those amounts by an appropriate range of relevant multiples obtained from comparable publicly traded companies (the "*Comparable Company Method*"), and (iii) a precedent transaction analysis, which entails determining key operating statistics of the Debtors and multiplying those amounts by an appropriate range of relevant multiples obtained from recent public transactions involving comparable companies (the "*Precedent Transaction Method*").

26. As is customary, Blackstone selected the relative weightings to be given to the valuation methodologies. In this case, the DCF Method was given the most weight because it is based upon projected cash flows of the Debtors' long-term business plan, capturing both the long-term opportunity and the capital investment required beyond 2010. The DCF method also better reflects the cyclicality of the Debtors' business. The Comparable Company Method was

---

[7] For instance, new U.S. housing starts reached a peak of 1.80 million in 2006, whereas the highest assumed level in the Projections is 1.45 million in 2014.

given less weight because no 'pure-play' comparable[8] to the Debtors' highly diversified business exists. The Debtors' business more closely resembles a conglomerate of numerous diverse business units rather than a compartmentalized, industry-specific business; to the extent the Debtors' competitors are diversified with multiple types of businesses that do not substantially overlap with the Debtors', it is impossible to match the Debtors' business against competitors in a true side-by-side comparison. In addition, less weight was given to the Comparable Company Method because it does not capture the potential upside – or the full impact – of recovery beyond 2010 in the Debtors' business plan, a notable point in light of the severity of the economic downturn. The Precedent Transaction Method was also given less weight than the DCF Method because of the extremely limited universe of recent transactions to consider as comparable. These transactions occurred in an entirely different economic period in which the ready availability of financing inflated multiples; a different market dynamic exists today. In addition, comparable companies used in the Precedent Transaction Method are not pure-play competitors of the Debtors, so the consideration paid (and the multiple derived) is not necessarily representative of what the Debtors would command given different markets, geography, size, product mix and margins. Under these circumstances, the DCF Method is the most relevant indicator of the Debtors' Enterprise Value. Accordingly, Blackstone weighted the DCF Method at 75%, the Comparable Company Method at 20%, and the Precedent Transaction Method at 5%.

27.     The calculus by which weighting levels for the three different valuation techniques were selected is illustrated in Exhibit A hereto ("*Valuation Methodology Weighting*"). We added the estimated ending cash balance of the Debtors at 12/31/09 of $107

---

[8] A pure-play comparable would be a company whose business model exactly matches that of the Debtors.

million as provided for in the Disclosure Statement to the Weighted Average Range of $0.94 billion to $1.25 billion to arrive at a Distributable Value of $1.05 billion and $1.35 billion.[9]

28.     *The DCF Method.*  The DCF Method is a forward-looking enterprise valuation methodology that estimates the present value of the projected cash flows to be generated from the business and theoretically available to the capital providers of the Debtors. The discounted cash flow analysis discounts the expected future cash flows by a theoretical or observed discount rate, in this case determined by estimating the average cost of debt and equity for the subject company based upon analysis of similar publicly traded companies.  This approach has two components: (i) calculating the present value of the projected unlevered[10] after-tax free cash flows for a determined period and (ii) adding the present value of the terminal value of cash flows. Free cash flow is defined as operating profit, less unlevered cash taxes,[11] plus depreciation and amortization, less capital expenditures and less/(plus) increases/(decreases) in working capital. The terminal value represents the portion of Enterprise Value that lies beyond the time horizon of the available projections.  There are two methodologies to determine the terminal value: (i) assuming a perpetuity growth rate for the unlevered free cash flows beyond the projection period or (ii) applying a terminal multiple to the final period projected EBITDA.

29.     As explained in the Disclosure Statement, in performing the DCF analysis, Blackstone made assumptions for (i) the weighted average cost of capital (the "*WACC*," also known as the "*Discount Rate*"), which is used to calculate the present value of future cash flows;

---

[9] Cash is added back in since recoveries to the creditors of the Debtors would include cash as a measure of distributable value.

[10] Unlevered cashflows represent amounts available to all debt and equity holders, and thus have not been reduced by interest or principal payments.  This is in contrast to levered cashflows, which are used to determine Equity Value.

[11] Cash taxes were forecasted using an assumed 39.5% tax rate and no cash flow benefit from potential net operating losses ("*NOLs*").

(ii) the perpetuity growth rate, which is used to determine the terminal value of the Debtors; and (iii) the terminal EBITDA multiple, which can also be used to determine the terminal value of the Debtors. Blackstone used a range of perpetuity growth rates from 2.0% to 4.0% for the Reorganized Debtors, which reflects the assumption that the Reorganized Debtors continue to grow conservatively in a steady, mature state beyond the projection period in perpetuity.[12] The strength of the perpetuity method is that it is not driven by comparable companies to derive a growth rate. Since the Debtors' business is GDP-driven, its perpetuity growth rate should approximate a U.S. GDP growth rate. Blackstone used a range of Discount Rates from 13.0% to 15.0% for the Reorganized Debtors, which reflects a number of company and market-specific factors, and is calculated based on the cost of capital for companies that Blackstone deemed comparable. For the alternate method of calculating terminal value, Blackstone used a terminal 2014 EBITDA multiple range of 6.0x to 8.0x for the Reorganized Debtors.

30. The Debtors' six-year projections for fiscal years 2009 through 2014 were used to calculate the free cash flows during the forecast period under the DCF Method, even though the projections provided in the Disclosure Statement only reference the period 2009 through 2012.[13]

31. *The Comparable Company Method.* The Comparable Company Method determines Enterprise Value by applying market trading multiples to the Debtors' recent and projected financial performance. Market EBITDA multiples are determined by dividing the Total Enterprise Value of publicly-traded comparable companies by their estimated 2009 and

---

[12] In the perpetuity growth method, the terminal value is determined by applying an appropriate long-term growth rate to the Debtors' estimated 2014 steady-state unlevered free cash flow. Steady-state cash flows are adjusted for capital expenditures and net working capital.

[13] Because the 10% Notes mature in 2013, projections in the Disclosure Statement cover the period through 2012 as sufficient disclosure.

2010 EBITDA. Total Enterprise Value ("*TEV*") includes the market value of equity plus the market value of all outstanding funded debt, minority interest and preferred stock, less cash.

32.    There are several steps involved in the Comparable Company Method: (i) the selection of comparable public companies to be used for comparison purposes; (ii) the calculation of key operating statistics of comparable companies, such as EBIT or EBITDA, considered to be representative of the Debtors' operating performance; and (iii) the calculation of Enterprise Value, including any necessary adjustments, for comparable companies.

33.    As explained in the Disclosure Statement, a key factor to the Comparable Company Method is the selection of companies with relatively similar business and operational characteristics to the Reorganized Debtors. Criteria for selecting comparable companies include, among other relevant characteristics, lines of business, business risks, key business drivers, growth prospects, maturity of businesses, market presence and brands, size and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation. Given the wide variety of businesses in which the Debtors operate, the selection of comparable pure-play companies is very limited; the Debtors are organized as a unique conglomerate.[14] The Debtors have few direct competitors, and many that are direct competitors are privately-owned. As such, Blackstone performed a comparable company analysis on a sum-of-the-parts basis, valuing each of the Debtors' four main operating segments individually and adjusting for corporate allocations.

34.    In performing our valuation based on the Comparable Company Method, Blackstone used the Debtors' projected 2009E and 2010E EBITDA (the "*Relevant Metrics*"),

---

[14] For example, one of the companies to which we compared the Debtors, Masco, is distinguishable because the vast majority of its revenues -- 76% -- is derived from paint and plumbing sales. Nortek has no such operations. Masco has a larger revenue base ($8 billion) and 15-20% of sales are in Europe. At best, one quarter of Masco's business is comparable to one quarter of Nortek's business lines (RVP).

and applied this methodology to each of the Debtors' four relevant business units. We ultimately determined that the following companies were the most comparable to the Debtors, categorized by business unit: American Woodmark Corp.; Gibraltar Industries, Inc.; Masco Corporation; and Stanley Works [RVP]; DEI Holdings, Inc.; Harman Int'l Industries, Inc.; Napco Security Tech., Inc.; and Universal Electronics, Inc. [HTP]; AAON, Inc.; Ingersoll-Rand Co., Ltd.; LSB Industries, Inc.; and United Technologies Corp. [C-HVAC]; and Lennox International, Inc.; Ingersoll-Rand Co., Ltd.; Johnson Controls, Inc.; United Technologies Corp. [R-HVAC] (collectively, the "*Comparable Companies*").

35. Our comparable company analysis is illustrated in Exhibit B hereto- ("*Comparable Company Method*")

36. As is standard, Blackstone picked a group of Comparable Companies based on qualitative and quantitative factors relative to the Debtors. Although Blackstone took into account multiples for all Comparable Companies, given the lack of truly comparable companies, the smaller size of the Debtors' businesses relative to certain competitors, and the fact that Comparable Companies are likely trading above historical averages due to lower earnings (not necessarily better performance or prospects), we selected a range of multiples to apply to the Debtors based on their financial and operating characteristics. We then applied the resulting range of multiples to the Debtors' Relevant Metrics to arrive at implied Enterprise Values.

37. *The Precedent Transaction Method.* The Precedent Transaction Method determines Enterprise Value by applying the Debtors' financial performance (usually EBITDA) to a multiple of observed consideration paid for comparable companies' financial performance at the time of the transaction. The observed transactions represent the levels at which willing buyers and sellers transact in the market. The Precedent Transaction Method estimates the value

of the subject company by examining public merger and acquisition transactions that involve a change of control in ownership. Transaction multiples are calculated based upon the purchase price (including any debt assumed, if applicable) paid to acquire such companies. Blackstone examined publicly reported transactions in North America involving companies with operations similar to those of the Debtors' business units. Blackstone analyzed TEV/LTM[15] EBITDA multiples for these transactions based upon publicly available information from relevant SEC filings, news releases and research reports.

     38.    Given the wide variety of businesses in which the Debtors operate, the selection of transactions involving truly comparable companies is limited. As such, Blackstone performed a sum-of-the-parts-based precedent transaction analysis, using a number of generally comparable transactions to value the four main operating segments individually and adjusting for corporate allocations, such as overhead, rent and other general and administrative expenses. Even those comparable transactions used are not necessarily that relevant in ascertaining the companies' Enterprise Value, since most occurred prior to the economic downturn of 2007 when the capital markets were operating in a more robust, healthy state. Blackstone deemed multiples of LTM EBITDA most relevant for analyzing the group of precedent transactions.

     39.    We ultimately determined that the following precedent transactions had the closest relevancy to the Debtors, categorized by business unit:[16] American Standard/Bain Capital; WII Components/Olympus Partners; Zurn/Rexnord; and Beauceland/MAAX [RVP]; Polk Audio/DEI Holdings; Altec Lansing/Plantronics; The Holmes Group/Jarden; and Boston Acoustics/D&M Holdings [HTP]; and Trane/Ingersoll-Rand; Goodman Global/Hellman &

---

[15] Last Twelve Months. LTM EBITDA is the trailing 12-month EBITDA level of a subject company.

[16] For purposes of the Precedent Transaction Method, we conflated the Debtors' residential and commercial HVAC business units into a single HVAC business unit.

Friedman; York International/Johnson Controls; and Airxcel/Bruckmann, Rosser, Sherrill [HVAC] (collectively, the *"Comparable Transactions"*).

        40.    Our precedent transaction analysis is illustrated in Exhibit C hereto (*"Precedent Transaction Method"*)

        41.    We adjusted the multiples of the Comparable Transactions for qualitative and quantitative factors relative to the Debtors' business. We then applied the resulting range of multiples to the Debtors' Relevant Metrics to arrive at implied Enterprise Values. Although Blackstone took into account multiples for all of the Comparable Transactions, based on the fact the universe of transactions involving truly comparable companies is very narrow, we selected a range to apply to the Debtors based on their financial and operating characteristics.

### Summary of Valuation Methodologies Employed By Blackstone

        42.    As a result of applying the three different valuation methodologies described above, Blackstone determined that the Debtors have an indicative Enterprise Value between $1.0 billion and $1.3 billion. This conclusion is based on the results of the DCF Method, the Comparable Company Method and the Precedent Transaction Method. As discussed in paragraph 26, greater weight was placed on the DCF Method given (1) the lack of companies that are truly comparable to the Debtors in terms of business overlap, size, margins, and diversification; and (2) the currently depressed market as it affects both (i) the universe of potential precedent transactions and (ii) the applicability of comparable company multiples that are driven partially by lower EBITDA and are not reflective of longer-term opportunity.

### The Plan Is Fair And Equitable To All Classes Of The Debtors' Creditors

        43.    One of the objectives of Blackstone's engagement was to formulate the Valuation in order to arrive at an implied Enterprise Value and, based on that analysis, determine

the Debtors' ability to pay its respective Creditor classes to the fullest extent possible in a restructuring.

44.    The Plan is the product of negotiations over several months between the Debtors, assisted by Blackstone, and their creditors, including the representatives of the holders of (i) more than 66 2/3% of the outstanding principal amount of 8½% Notes, (ii) a majority of the outstanding principal amount of the 10¾% Notes, and (iii) a significant portion of the outstanding principal amount of the 10% Notes who voted to accept the Plan.

45.    As described in the Disclosure Statement, under the Plan: (i) holders of ABL Facility Claims will, absent an agreement to amend the existing ABL Facility, receive Cash from Nortek in the full amount of their Claims; (ii) the holders of the 10% Notes will receive from Nortek their pro rata share of New Nortek Senior Secured Notes having an aggregate principal amount equal to $750 million plus the amount of accrued and unpaid interest payable under the 10% Notes as of the Effective Date, as well as their pro rata share of 5% of the New Common Stock. (iii) the holders of the 8½% Notes will receive from Nortek their pro rata share of 91.5630% of the outstanding shares of New Common Stock; (iv) the holders of Nortek Series A and Series B 9 ⅞% Senior Subordinated Notes due 2011 (the "9⅞% Notes") will receive from Nortek their pro rata share of 1.4370% of the outstanding shares of New Common Stock; (v) the holders of the 10¾% Notes will receive from Nortek their pro rata share of 1.1762% of the outstanding shares of New Common Stock and New Warrants exercisable for 2.9404% of the outstanding shares of New Common Stock as of the Effective Date assuming the exercise of all the New Warrants; and (vi) the holders of NTK Holdings Senior Unsecured Loan will receive 0.8238% of the outstanding shares of New Common Stock and New Warrants exercisable for 2.0596% of the outstanding shares of New Common Stock as of the Effective Date assuming the exercise of all the New Warrants. Each holder of an Allowed NTK Holdings General Unsecured

19

Claim, Allowed Nortek Holdings General Unsecured Claim, or Allowed Nortek General Unsecured Claim which is not due and payable on or before the Effective Date will receive payment in full in Cash of the unpaid portion of such Claim.

46.     As stated above, Blackstone estimates a New Equity Value range of $172 million to $472 million. The midpoint of the New Equity Value range is approximately $322 million. Blackstone estimates the hypothetical recovery to holders of the 8½% Notes to be 23.9% to 65.6% based on an estimated claim of $659 million. The recovery to the holders of the 8½% Notes is based on their receipt of 91.5630% of the New Common Stock. Blackstone estimates the hypothetical recovery to holders of the 9⅞% Notes to be 23.9% to 65.6% based on an estimated claim of $10 million. The recovery to the holders of the 9⅞% Notes is based on their receipt of 1.4370% of the New Common Stock. Blackstone estimates the hypothetical recovery to holders of the NTK Holdings Senior Unsecured Loan to be 0.5% to 1.9% based on an estimated claim of $282 million. The recovery to the holders of the NTK Holdings Senior Unsecured Loan is based on their receipt of 0.8238% of the New Common Stock and 41.1915% of the New Warrants. Blackstone estimates the hypothetical recovery to the holders of the 10¾% Notes to be 0.5% to 1.9% based on an estimated claim of $403 million. The recovery to the holders of the 10¾% Notes is based on their receipt of 1.1762% of the New Common Stock and 58.8085% of the New Warrants. The projected recoveries are substantially based on the Debtors achieving the business plans underlying the Projections. *See* Disclosure Statement at 73-74.

47.     I believe that the distribution scheme contemplated by the Plan is fair and equitable to all classes of the Debtors' creditors based upon the Valuation.

48.     Our Illustrative Waterfall recovery analysis, which does not take into account the actual distribution scheme of the Plan but ascribes value to each claimant based upon the absolute priority rule, is illustrated in Exhibit D hereto (*"Illustrative Waterfall"*)

49.     As shown in Exhibit D, the holders of the ABL Facility Claims and the 10% Notes would obtain a full recovery on their Claims.

50.     Under the highest end of the valuation range, holders of the 8½% Notes would receive a 70.6% recovery on their Claims.  The same level of recovery would also be obtained by holders of the 9⅞% Notes.  Significantly, both of these Impaired Classes of Creditors have voted in favor of the Plan even though they are receiving less than what Exhibit D implies.

51.     As a result of cross-ownership between holders of the 8½% Notes and the 10% Notes, among other factors, the Ad Hoc Committee and its advisors indicated a strong preference during their negotiations with the Debtors and their advisors to provide equity to holders of the 10% Notes in order to reach a consensual resolution.  This approach, which required holders of the 8½% Notes to give up a percentage of the recovery to which they are entitled under the Valuation, facilitated the formulation of the Plan with the Debtors.

52.     Further, the Plan distribution is fair to the holders of the NTK Holdings Senior Unsecured Loan and the 10 ¾% Notes (*"NTK Creditors"*) because they will receive their pro rata share of 2.0% of the outstanding shares of New Common Stock and New Warrants exercisable for 5.0% of the outstanding shares of New Common Stock – more than they would be entitled to receive under even the highest end of the valuation range.  As Exhibit D illustrates, those NTK Creditors are "out of the money" under any valuation scenario; even at the highest end of the valuation range, there would be no recovery by these NTK Creditors.  However, given Management's strong preference for deleveraging and its desire to fix the Debtors' capital

structure immediately and permanently, and as a result of negotiations among all classes of creditors, consideration is being provided to the NTK Creditors under the Plan in order to encourage cooperation and achieve an expeditious and orderly restructuring.

53.     Even if the holders of the 8½% Notes had not agreed to relinquish some portion of the value of their Claims in order to induce holders of the 10% Notes to agree to a consensual resolution, the difference in value in the distribution received by holders of the 8½% Notes still would not be sufficient to confer any additional benefit on the NTK Creditors. The difference would be absorbed by the relative distribution to holders of the 8½% Notes, still leaving the NTK Creditors in an "out of the money" position.

54.     Moreover, in connection with the Confirmation Hearing, Blackstone updated the Valuation as of December 2009 to account for events that have occurred since July 2009, principally: (i) the actual operating performance of the Debtors, and (ii) updated comparable company multiples. Holding the weightings of the Valuation constant, we estimate that the Debtors' Weighted Average Range to be $0.96 billion to $1.25 billion. Adding the estimated ending cash balance of the Debtors at 12/31/09 of $107 million as provided for in the Disclosure Statement, we arrive at a relatively unchanged Distributable Value of $1.06 billion to $1.36 billion. We are continuing to use 2009 EBITDA multiples for our Comparable Company Method. In our estimation, NTK Creditors continue to be out of the money; in order for NTK Creditors to be entitled to any recovery, the Enterprise Value must exceed $1.6 billion – this is nearly $250-300 million more than the highest range we estimate under any refreshed Valuation.

55.     Accordingly, as shown by the Valuation, I believe that the distribution scheme contemplated by the Plan is fair to all classes of the Debtors' Creditors.

**The Plan Satisfies The Cramdown Requirements Under § 1129(b)**

56.     I am informed by bankruptcy counsel that § 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a plan where not all impaired classes of claims and equity interests accept a plan. This mechanism is known colloquially as "cramdown." The Bankruptcy Court may "cramdown" a plan despite its rejection by impaired classes of claims or equity interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such classes.

57.     A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class, and the "fair and equitable" requirement, as set forth in § 1129(b)(2) of the Bankruptcy Code, is satisfied if (x) the holders of claims in classes senior to the dissenting class are receiving less than full payment on their claims and (y) the holders of claims and interests in classes junior to the dissenting class are not receiving any property under the Plan.

58.     In this case, one impaired Class – NTK Holdings Class 3 (holders of the NTK Holdings Senior Unsecured Loan) – rejected the Plan. For the reasons described above, the Plan does not "unfairly discriminate" and the "fair and equitable" requirements are satisfied with respect to the NTK Holdings Senior Unsecured Loan. The Debtors therefore assert that there is no unfair discrimination resulting from the separate classification of this class and that § 1129(b) is satisfied.

59.     Further, the "fair and equitable" rule is satisfied as to the holders of the NTK Holdings Senior Unsecured Loan because the Plan maintains the relative priority among the classes and under the Plan, no creditor or equity interest holder retains or recovers more than the value of his or her respective claim or interest (*e.g.*, par).

23

**The Plan Is Feasible**

60.     Blackstone has reviewed the Projections and believes the Plan satisfies the feasibility requirement of § 1129(a)(11) of the Bankruptcy Code. I believe that, as of the occurrence of the Effective Date, the Reorganized Debtors will, on a consolidated basis, (a) be able to meet their debts as such debts mature, and (b) not be left with unreasonably small available capital to operate their businesses as a result of the Plan or any transactions contemplated by the Plan.

61.     Based on the foregoing, the Plan satisfies the "feasibility" test for emergence from bankruptcy under § 1129(a)(11) of the Bankruptcy Code and will result in the Reorganized Debtors emerging from bankruptcy as a viable business – that is, confirmation of the Plan is not likely to be followed by the liquidation of the Reorganized Debtors or by the need for a further reorganization of the Reorganized Debtors.

## Conclusion

I believe that the Debtors have developed a sound plan to maximize value. I believe that the Plan is feasible. I further believe that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or the Reorganized Debtors. After the Effective Date, the Reorganized Debtors should have adequate capital to meet their ongoing obligations, and will be under the control of competent management.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Executed this __1 st__ day of December 2009 in New York, New York.

Timothy R. Coleman

# Exhibit A
## Valuation Methodology Weighting

*($ in millions)*

| Methodology | Low Value | Weight | Medium Value | Weight | High Value | Weight |
|---|---|---|---|---|---|---|
| **Discounted Cash Flow - Exit Multiple** | | | | | | |
| Consolidated | $ 1,074 | 20.0% | $ 1,247 | 20.0% | $1,420 | 20.0% |
| Business Units | 1,039 | 20.0% | 1,205 | 20.0% | 1,370 | 20.0% |
| **Discounted Cash Flow - Perpetuity Growth** | | | | | | |
| Consolidated | 798 | 17.5% | 938 | 17.5% | 1,077 | 17.5% |
| Business Units | 785 | 17.5% | 921 | 17.5% | 1,058 | 17.5% |
| **Comparable Companies - 2009E** | | | | | | |
| Consolidated | 953 | 5.0% | 1,089 | 5.0% | 1,225 | 5.0% |
| Business Units | 954 | 5.0% | 1,092 | 5.0% | 1,230 | 5.0% |
| **Comparable Companies - 2010E** | | | | | | |
| Consolidated | 958 | 5.0% | 1,118 | 5.0% | 1,277 | 5.0% |
| Business Units | 958 | 5.0% | 1,118 | 5.0% | 1,278 | 5.0% |
| **Precedents - 2009E** | | | | | | |
| Business Units | 1,021 | 5.0% | 1,159 | 5.0% | 1,297 | 5.0% |
| **Total** | | 100.0% | | 100.0% | | 100.0% |
| **Weighted Average Range** | $ 942 | | $ 1,094 | | $ 1,247 | |

The **Blackstone** Group®

# Exhibit B
## Comparable Company Method

## RVP Segment
*($ in millions, except per share amounts)*

| | Stock Price as of 7/28/09 | Total Market Cap | Total Enterprise Value(1) | TEV/i Revenue 2009E | 2010E | TEV/EBITDA 2009E | 2010E | LTM Operating Margins Gross Mgm. | EBITDA | Revenue Growth | Credit Statistics Net Debt / EBITDA(2) | EBITDA / Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| American Woodmark Corp. | $23.70 | $334 | $279 | 0.6x | 0.6x | 9.2x | 7.3x | 16.5% | 4.8% | (13.0%) | NM | 36.8x |
| Gibraltar Industries, Inc. | 7.90 | 238 | 559 | 0.6x | 0.6x | 14.5x | 6.9x | 17.5% | 7.5% | (27.3%) | 3.7x | 3.2x |
| Masco Corp. | 13.17 | 4,732 | 8,055 | 1.1x | 1.0x | 17.0x | 12.4x | 24.1% | 7.0% | (20.9%) | 5.0x | 3.1x |
| Stanley Works | 39.55 | 3,127 | 4,544 | 1.2x | 1.2x | 8.2x | 8.3x | 38.4% | 15.4% | (14.6%) | 2.2x | 9.8x |
| Mean | | | | 0.9x | 0.9x | 12.2x | 8.7x | 24.1% | 8.7% | | 3.7x | 13.2x |
| Median | | | | 0.8x | 0.8x | 11.9x | 7.8x | 20.8% | 7.3% | | 3.7x | 6.5x |

## HTP Segment
*($ in millions, except per share amounts)*

| | Stock Price as of 7/28/09 | Total Market Cap | Total Enterprise Value(1) | TEV/i Revenue 2009E | 2010E | TEV/EBITDA 2009E | 2010E | LTM Operating Margins Gross Profit | EBITDA | Revenue Growth | Credit Statistics Net Debt / EBITDA(2) | EBITDA / Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DEI Holdings, Inc. | $0.11 | $3 | $213 | n.a | n.a | NM | NM | 47.6% | 17.5% | n.a. | 4.6x | 1.9x |
| Harman International Industrie | 23.35 | 1,619 | 1,940 | 0.7x | 0.7x | NM | 9.8x | 25.2% | 4.9% | (29.7%) | 2.0x | 47.1x |
| Napco Security Technologies, | 1.29 | 25 | 56 | 0.6x | 0.6x | 6.8x | 4.6x | 23.1% | NM | 17.7% | NM | NM |
| Universal Electronics Inc. | 20.35 | 277 | 211 | 0.7x | 0.6x | 6.9x | 5.7x | 32.3% | 8.7% | 7.0% | NM | NM |
| Mean | | | | 0.7x | 0.6x | 6.8x | 6.7x | 32.0% | 10.4% | | 3.3x | 24.5x |
| Median | | | | 0.7x | 0.6x | 6.8x | 5.7x | 28.7% | 8.7% | | 3.3x | 24.5x |

Source: Capital IQ as of 7/28/2009.
Note: Financial data as of 3/31/2009.
(1) Net debt and TEV calculations use the book value of debt method.
(2) Debt / LTM EBITDA calculation uses book value of debt.

The Blackstone Group®

## Exhibit B (Cont'd)
## Comparable Company Method

## HVAC Segments
($ in millions, except per share amounts)

| | Stock Price as of 7/28/09 | Market Cap | Total Enterprise Value [1] | TEV / Revenue 2009E | TEV / Revenue 2010E | TEV / EBITDA 2009E | TEV / EBITDA 2010E | Operating Margins LTM Gross Profit | Operating Margins LTM EBITDA | Revenue Growth | Credit Statistics Net Debt / EBITDA [2] | Credit Statistics EBITDA / Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AAON Inc. | $19.91 | $342 | $338 | 1.3x | 1.3x | 6.5x | 6.3x | 24.6% | 19.1% | (4.8%) | NM | NM |
| LSB Industries Inc. | 18.20 | 384 | 437 | 0.7x | 0.7x | 7.1x | 5.7x | 19.2% | 9.2% | (18.2%) | 0.7x | 6.8x |
| Ingersoll-Rand Co. Ltd. | 27.94 | 8,916 | 13,673 | 1.0x | 1.0x | 9.9x | 9.8x | 25.6% | 9.8% | 1.4% | 3.3x | 6.3x |
| Johnson Controls Inc. | 25.05 | 14,905 | 19,342 | 0.7x | 0.6x | 12.6x | 7.7x | 12.8% | 4.3% | (26.2%) | 3.3x | 5.9x |
| United Technologies Corp. | 52.44 | 49,360 | 57,187 | 1.1x | 1.1x | 7.4x | 7.1x | 27.2% | 15.5% | (9.8%) | 0.8x | 12.0x |
| Lennox International Inc. | 34.82 | 1,929 | 2,150 | 0.8x | 0.7x | 10.3x | 9.0x | 28.1% | 7.8% | (18.0%) | 0.9x | 22.3x |
| Mean | | | | 0.9x | 0.9x | 9.0x | 7.6x | 22.9% | 11.0% | | 1.8x | 10.6x |
| Median | | | | 0.9x | 0.9x | 8.7x | 7.4x | 25.1% | 9.5% | | 0.9x | 6.8x |

Source: Capital IQ as of 7/28/2009.
Note: Financial data as of 5/31/2009.
(1) Net debt and TEV calculations use the book value of debt method.
(2) Debt / LTM EBITDA calculation uses book value of debt.

The Blackstone Group®

## Exhibit C
### Precedent Transaction Method

**RVP Segment**
($ in millions)

| Date Announced | Target | Total Enterprise Value (TEV) | Buyers/Investors | LTM Revenue | LTM EBITDA | TEV/LTM Revenue | TEV/LTM EBITDA | Implied Margin |
|---|---|---|---|---|---|---|---|---|
| 06/12/2008 | MAAX Corporation | $265 | Brookfield Asset Mgmt. Inc. | $376 | $19 | 0.71x | 14.2x | 5.0% |
| 09/17/2007 | Glenow Windows & Doors Inc. | 178 | H.I.G. Capital, LLC | 198 | 31 | 0.90x | 5.8x | 15.4% |
| 07/23/2007 | American Standard Brands | 1,745 | Bain Capital, LLC | 2,604 | 215 | 0.67x | 8.1x | 8.3% |
| 12/11/2006 | WII Components Inc. | 295 | Olympus Partners | 289 | 39 | 1.02x | 7.6x | 13.4% |
| 10/11/2006 | Zurn Industries, Inc. | 942 | Rexnord LLC | 414 | 99 | 2.28x | 9.5x | 24.0% |
| 06/09/2006 | Royal Group, Inc. | 1,575 | Georgia Gulf Corp. | 1,534 | 103 | 1.03x | 15.3x | 6.7% |
| 07/15/2005 | GSW Inc. | 314 | AO Smith Corp. | 493 | 40 | 0.64x | 7.9x | 8.1% |
| 12/22/2004 | Masonite International, Inc. | 2,559 | Kohlberg Kravis Roberts & Co. | 2,200 | 289 | 1.16x | 8.9x | 13.1% |
| 03/10/2004 | Beauceland Corporation | 471 | MAAX Holdings, Inc. | 484 | 69 | 0.97x | 6.8x | 14.4% |
| 10/27/2003 | Atrium Corp. | 570 | Merrill Lynch Global PE et al. | 572 | 73 | 1.00x | 7.8x | 12.8% |
| 08/29/2003 | Norcraft Companies LP | 315 | Trimaran Capital Partners | 317 | 47 | 0.99x | 6.8x | 14.7% |
| 05/01/2003 | Air Vent, Inc. | 115 | Gibraltar Industries, Inc. | 58 | 16 | 1.98x | 7.4x | 26.7% |
| 04/04/2002 | Omega Cabinetry | 638 | MasterBrand Cabinets, Inc. | 341 | 63 | 1.87x | 10.2x | 18.4% |
| 12/30/1999 | Falcon Building Products, Inc. | 299 | FBP Industries Corp | 847 | 79 | 0.35x | 3.8x | 9.3% |
| | | | | | Mean | 1.11x | 8.6x | 13.6% |
| | | | | | Median | 1.00x | 7.8x | 13.3% |

Source: Capital IQ and Wall Street analyst reports.
Note: Analysis does not include announced Stanley Works acquisition of Black & Decker. The announced purchase price is $4.5 billion, implying a TEV / LTM Revenue multiple of 0.93x, a TEV / LTM EBITDA multiple of 11.0x (or 5.9x post-synergies), and an implied margin of 8.4%.

The Blackstone Group®

**Exhibit C (Cont'd)**
*Precedent Transaction Method*

## HTP Segment
*($ in millions)*

| Date Announced | Target | Total Enterprise Value (TEV) | Buyers/Investors | LTM Revenue | LTM EBITDA | TEV/LTM Revenue | TEV/LTM EBITDA | Implied EBITDA Margin |
|---|---|---|---|---|---|---|---|---|
| 08/21/2006 | Polk Audio, Inc. | $137 | DEI Holdings, Inc. | $85 | $18 | 1.62x | 7.5x | 21.6% |
| 02/09/2006 | Knape & Vogt Manufacturing | 101 | Wind Point Partners | 163 | 15 | 0.62x | 6.6x | 9.4% |
| 01/06/2006 | Water Pik Technologies Inc. | 328 | The Carlyle Group; Zodiac SA | 323 | 34 | 1.02x | 9.5x | 10.7% |
| 07/11/2005 | Altec Lansing Technologies | 182 | Plantronics Inc. | 142 | 26 | 1.28x | 7.0x | 18.3% |
| 06/28/2005 | The Holmes Group Inc. | 719 | Jarden Corp. | 799 | 111 | 0.90x | 6.5x | 13.8% |
| 06/09/2005 | Unwired Technology, LLC | 98 | American Capital, Ltd. | - | - | NA | NA | NA |
| 06/08/2005 | Boston Acoustics, Inc. | 74 | D&M Holdings US, Inc. | 59 | 7 | 1.25x | 10.2x | 12.2% |
| 09/19/2004 | American Household, Inc. | 846 | Jarden Corp. | 1,691 | 113 | 0.50x | 7.5x | 6.7% |
| 01/16/2003 | LOUD Technologies Inc. | 82 | Sun Capital Partners, Inc. | 188 | (6) | 0.44x | NM | (3.3%) |
| 12/22/2000 | Unican Security Systems Ltd. | 551 | Kaba Holding AG | 319 | 59 | 1.73x | 9.4x | 18.4% |
| | | | | | Mean | 1.04x | 8.0x | 12.0% |
| | | | | | Median | 1.02x | 7.5x | 12.2% |

Exhibit C (Cont'd)
*Precedent Transaction Method*

## HVAC Segments
*($ in millions)*

| Date Announced | Target | Total Enterprise Value (TEV) | Buyers/Investors | LTM Revenue | LTM EBITDA | TEV/LTM Revenue | TEV/LTM EBITDA | Implied Margin |
|---|---|---|---|---|---|---|---|---|
| 12/15/2007 | Trane Inc. | $11,408 | Ingersoll-Rand Co. Ltd. | $11,674 | $1,236 | 0.98x | 9.2x | 10.6% |
| 10/21/2007 | Goodman Global, Inc. | 2,532 | Hellman & Friedman LLC | 1,902 | 255 | 1.33x | 9.9x | 13.4% |
| 03/01/2006 | Selkirk, L.L.C. | 127 | Tomkins plc - Air Systems | 130 | - | 0.98x | NA | NA |
| 08/24/2005 | York International Corp. | 3,009 | Johnson Controls Inc. | 4,682 | 236 | 0.64x | 12.8x | 5.0% |
| 07/21/2005 | Aircel, Inc. | 235 | Bruckmann, Rosser, Sherrill & Co. | 190 | 21 | 1.24x | 11.3x | 10.9% |
| 07/17/2005 | Maytag Corporation | 2,744 | Whirlpool Corp. | 4,748 | 280 | 0.58x | 9.8x | 5.9% |
| 11/18/2004 | Goodman Global Holdings Inc. | 1,622 | Apollo Management, L.P. | 1,318 | 150 | 1.23x | 10.8x | 11.4% |
| 06/05/2001 | Amana Appliances | 325 | Maytag Corporation | 900 | - | 0.36x | NA | NA |
| 07/12/1999 | Trion, Inc. | 49 | Fedders North America, Inc. | 57 | 4 | 0.87x | 11.4x | 7.7% |
| 06/24/1999 | International Comfort Products | 740 | Carrier Corporation | 759 | 74 | 0.97x | 10.0x | 9.8% |
| 05/01/1999 | Ducane Co. (AC & Heating Div.) | 53 | Lennox International Inc. | - | - | NA | NA | NA |
| | | | | | Mean | 0.92x | 10.7x | 9.3% |
| | | | | | Median | 0.98x | 10.4x | 10.2% |

Source: Capital IQ and Wall Street analyst reports.

 The Blackstone Group®

## Exhibit D
## *Illustrative Waterfall*

*($ in millions)*

| | Value of Claims | Estimated Recoveries | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Low $ | Low % | Mid $ | Mid % | High $ | High % |
| Preliminary Indicative Enterprise Value Range | | $1,000.0 | | $1,150.0 | | $1,300.0 | |
| Plus: Estimated Cash[1] | | 107.0 | | 107.0 | | 107.0 | |
| Total Distributable Value | | $1,107.0 | | $1,257.0 | | $1,407.0 | |
| | | | | | | | |
| Recovery Analysis | | | | | | | |
| Subsidiary Level Debt | $50.0 | $50.0 | 100.0% | $50.0 | 100.0% | $50.0 | 100.0% |
| | | | | | | | |
| *OpCo Debt* | | | | | | | |
| ABL Facility | $135.0 | $135.0 | 100.0% | $135.0 | 100.0% | $135.0 | 100.0% |
| 10% Senior Secured Notes | 750.0 | 750.0 | 100.0% | 750.0 | 100.0% | 750.0 | 100.0% |
| 9.875% Notes Due 2011 | 10.3 | 2.7 | 25.7% | 5.0 | 48.1% | 7.3 | 70.6% |
| 8.5% Senior Sub Notes | 658.6 | 169.3 | 25.7% | 317.0 | 48.1% | 464.7 | 70.6% |
| Total OpCo Debt | $1,554.0 | $1,057.0 | 66.0% | $1,207.0 | 77.7% | $1,357.0 | 87.3% |
| | | | | | | | |
| *HoldCo Debt* | | | | | | | |
| Bridge Loan | $282.3 | $- | 0.0% | $- | 0.0% | $- | 0.0% |
| 10.75% Notes Due 2014 | 403.0 | - | 0.0% | - | 0.0% | - | 0.0% |
| Total HoldCo Debt | $685.3 | $- | 0.0% | $- | 0.0% | $- | 0.0% |
| | | | | | | | |
| Total | $2,289.3 | $1,107.0 | 48.4% | $1,257.0 | 54.9% | $1,407.0 | 61.5% |

[1] Estimated cash as of 12/31/2009 per Disclosure Statement.

The **Blackstone** Group®